865 F.Supp. 585 (1994)
Placido L. ROMERO, Plaintiff,
v.
UNITED STATES of America, Defendant.
No. 4:91 CV 608 DDN.
United States District Court, E.D. Missouri, Eastern Division.
May 2, 1994.
Memorandum Amending Judgment October 5, 1994.
*586 *587 Robert C. Ozer, Christopher Felton, Anthony L. Sokolow, Ozer and Mullen, Denver, CO, for plaintiff.
Henry J. Fredericks, Asst. U.S. Atty., Office of U.S. Atty., St. Louis, MO, for defendant.

OPINION
NOCE, United States Magistrate Judge.
This action is before the Court following a non-jury trial. Plaintiff Placido L. Romero brought this suit against the United States under the Federal Tort Claims Act ("the Act"), 28 U.S.C. §§ 2671 et seq. The parties consented to the exercise of authority by the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c)(3). This Court has subject matter jurisdiction over the action under 28 U.S.C. § 1346(b).
Plaintiff Romero alleged two instances of negligent medical malpractice against certain physicians employed by the Veterans Administration at the John Cochran Medical Center in St. Louis, Missouri. The parties agreed that plaintiff has complied with all of the jurisdictional requirements of the Act. Defendant has admitted all allegations of negligent malpractice. However, the government joined issue over the nature, extent, and amount of plaintiff's damages.
Following a non-jury trial, the Court makes the following findings of fact and conclusions of law:

FACTS
1. Plaintiff Placido L. Romero was born on March 2, 1921. He is a veteran of the Army Air Corps from which he was discharged as a corporal in 1945. He has resided in Illinois and Wisconsin since his military discharge.
2. When plaintiff was discharged from the military, he became an auto mechanic, receiving his technical training from General Motors while on the job. He worked as an automobile mechanic until 1962, first in Chicago, Illinois, then in St. Louis, Missouri. After 1962, he was employed part-time as a carpet installer.
3. Plaintiff is, and has been for a long time, a heavy cigarette smoker. Although he has tried to quit smoking, he was not successful. Before 1988, his throat was occasionally sore and painful and bled; on occasion, he could not speak normally.
*588 4. During 1987, plaintiff earned $1,791.00 working part-time. During 1988, prior to his surgery, he earned $1,088.00.[1]
5. In March 1988, plaintiff presented himself to the Veterans Administration Hospital in Waukegan, Illinois, complaining of a sore throat and difficulty in swallowing. He was examined and treated as an outpatient. At this time he was unemployed and living in Wisconsin with his daughter, Angela Lozano.
6. In May 1988, plaintiff sought treatment at the John Cochran Veterans Administration Medical Center in St. Louis because of painful and difficult swallowing and a mass lesion on the supraglottis. At John Cochran Medical Center he was seen by Drs. James D. Warren and Matthew Nagorski.
7. On June 7, 1988, plaintiff underwent a CT scan and a laryngoscopy (an examination of his larynx). The CT scan disclosed a second tumor in the nasal area which was inoperable. The radiology report recommended a biopsy for further evaluation. Also on June 7, a biopsy was performed on the mass on the supraglottis.
8. The biopsy specimen was examined by physicians, licensed to practice medicine in Missouri, who were employees of the defendant United States at the John Cochran Veterans Administration Medical Center. On June 9, 1988, a poorly differentiated squamous cell carcinoma with ulcer (the tumor present in the submucosal area) was diagnosed. This reading and diagnosis fell below the standard of care that is practiced by reasonably competent medical practitioners under the same or similar circumstances in the same or similar locality in the following respects:
a. the biopsy specimen contained lymphoma, not squamous cell carcinoma;
b. the biopsy report was unclear;
c. the examining physicians failed to perform or have performed additional studies which were readily available which would have produced a correct diagnosis of lymphoma.
9. Generally, squamous cell carcinoma can be treated surgically; lymphoma cannot be treated surgically. As a result of the diagnosis of squamous cell carcinoma, on June 24, 1988, surgery was performed by physicians, licensed to practice medicine in Missouri, who were employed by the defendant United States at the John Cochran Veterans Administration Medical Center. The surgeons believed this surgery was appropriate for the diagnosis of squamous cell carcinoma. They performed a direct laryngoscopy (an examination of the larynx), a nasal pharyngoscopy (an examination of the pharynx), a tracheotomy, bilateral functional neck dissections, removal of the lymph glands, a supraglottic sub-total laryngectomy (partial removal of the epiglottis), and a cricopharyngeal myotomy. The partial removal of plaintiff's epiglottis thereafter allowed food, water, saliva, mucus, and other substances to enter his trachea and his lungs. This caused plaintiff increased susceptibility to infection and pneumonia.
10. The June 24 surgery fell below the standard of medical care as practiced by reasonably competent medical practitioners, under the same or similar circumstances, in the same or similar locality, in the following respects:
a. The surgery was performed, notwithstanding the clear and unequivocal contraindication to such surgery presented by the tumor that was shown to exist and subsequently known to exist in plaintiff's nasopharynx. This tumor was known to be incurable by surgery because of its location, regardless of the type of cancer it was.
b. The surgery was performed on the plaintiff without obtaining a final determinative pathology opinion with respect to the tumor in plaintiff's nasopharynx; and
c. The June 9 biopsy report was unclear.
11. The surgery of June 24, 1988, lasted nine hours and was followed by sixteen days' hospitalization during which plaintiff was medicated for pain, kept in intensive care for three days, and rendered unable to eat or breathe except through a tube placed through his nose.
*589 12. After the surgery, and while still at John Cochran Medical Center, plaintiff was given an appointment for post-operative radiation and chemotherapy. Technical difficulties with the therapy equipment caused a delay. Plaintiff remained in need of treatment for the lymphoma, from which he was still suffering. He did not receive treatment for the lymphoma during that hospitalization.
13. On July 5, 1988, the correct diagnosis of plaintiff's condition became known and was reported by telephone by the Armed Forces Institute of Pathology to plaintiff's then treating physician. Nevertheless, the previous diagnosis of squamous cell carcinoma was never changed.
14. On July 9, 1988, plaintiff was discharged from the hospital. A course of outpatient follow-up treatment was prescribed for squamous cell carcinoma, from which it was known he was not suffering.
15. Plaintiff returned to Wisconsin to live with his daughter, Angela. Left untreated, plaintiff's nasal tumor grew rapidly. The tumor displaced the feeding tube that had been placed in plaintiff's nose. Plaintiff went to a hospital, where the doctors who treated him were unaware that he had a tumor in his nose. These doctors attempted to force his feeding tube through the tumor tissue, causing laceration, bleeding, and pain. Only when plaintiff's daughter advised them about the nasopharyngeal tumor did they obtain a smaller feeding tube which they succeeded in inserting.
16. By mid-July, 1988, the untreated tumor had caused a backup of fluid into plaintiff's ear which necessitated a surgical perforation of plaintiff's eardrum. The perforation has caused permanent hearing impairment.
17. Thereafter, a feeding tube was surgically sewn directly into his stomach, through his belly. After this surgery, an infection occurred, caused by a fistula from plaintiff's stomach into his abdominal cavity. Plaintiff was returned to the hospital for emergency treatment in the form of a laparotomy. When the stomach tube was removed, black, foul smelling fluid was produced.
18. Thereafter, plaintiff was subjected to another surgery, with extended hospitalization, to treat the abdominal infection and to put a second feeding tube into his stomach.
19. Plaintiff then began an extended period of chemotherapy and radiation during which he was hospitalized for several bouts of pneumonia. One such hospitalization lasted from January 21 to February 20, 1989. In March, 1989, plaintiff's tracheostomy tube was removed and the stoma healed satisfactorily.
20. Upon release from the hospital, plaintiff was nursed by his daughters for several months until he was relocated back in the St. Louis area. Plaintiff did very poorly with continued weight loss. The nutrition provided through the feeding tube into his stomach was insufficient to nourish him adequately.
21. In October 1989 plaintiff was seen by Dr. Gershon Spector at Barnes Hospital in St. Louis. In January, 1990, plaintiff underwent a complete, total laryngectomy (secondary to the partial, supraglottic laryngectomy of June 24, 1988). Plaintiff's trachea was separated entirely from his digestive tract and brought through a hole in his neck. Plaintiff now breathes through this hole exclusively. As a result of Dr. Spector's surgery, for the first time since June 24, 1988, plaintiff was able to take food by mouth, subject to severe limitations and regurgitative problems.
22. This second throat surgery has resulted in the total permanent loss of his natural voice and a significant loss of the ability to smell and taste. This surgery has also caused chronic infections, chronic bronchitis, an inability to clear his own secretions, severe deficiencies in breathing, and severe limitations in obtaining nutrition.
23. But for the surgery of June 24, 1988, plaintiff would not have required the surgeries which followed. All of his surgeries resulted in an ear-to-ear scar around which there is a loss of sensation; the removal of plaintiff's lymphs, muscles, and glands in the surgical areas; the hardening of neck tissue; the loss of the sense of smell; the partial loss of the sense of taste; the loss of a substantial *590 amount of hearing; substantial pain; and substantial mental anguish.
24. As of the time of trial, plaintiff was a 72 year-old man appearing his stated age. He was mildly overweight and in no apparent distress. He has the typical findings of a total laryngectomy, with an end tracheostomy in the suprasternal notch. He has a well-healed apron incision, with no excessive scarring.
25. Plaintiff's current speech is that of a typical total laryngectomy with an electrolarynx, notwithstanding the deliberate lowering of the volume of his electrolarynx for courtroom presentation. His articulation is relatively good; approximately seventy-five percent of his speech is understandable. His tongue function is normal. He has some decreased sensation throughout his neck and upper shoulders. His nasal cavity is relatively unremarkable, and he states his sense of smell is decreased. There is no evidence of cranial nerve neuropathies secondary to the surgeries, other than his claim of decreased sense of smell, due to the lack of nasal airflow.
26. As a direct result of the diagnosis of June 9, 1988, and the medical surgery of June 24, 1988, plaintiff has suffered:

(a) Past noneconomic damages: $500,000.00
(b) Future noneconomic damages: 100,000.00
(c) Past economic damages:
 (1) Medical: 53,000.00
 (2) Lost Earnings: 10,000.00
(d) Future economic damages:
 (1) Medical: 10,000.00
 (2) Earnings: 0.00
 ___________
 TOTAL $673,000.00

DISCUSSION
As set forth above, the parties have stipulated that the defendant is liable for plaintiff's damages which were caused by the negligent medical malpractice received on account of the misdiagnosis of the biopsy on June 9, 1988, and the surgery of June 24, 1988. The factual issues relating to causation of damages are determined above.
Under the Federal Tort Claims Act, the Court must apply the substantive law of Missouri to reach final judgment. 28 U.S.C. § 1346(b); Richards v. United States, 369 U.S. 1, 10, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962); Lewis v. United States, 663 F.2d 818, 819 n. 2 (8th Cir.1981). The cardinal issues of law remaining for decision are whether plaintiff is subject to the maximum limitation on noneconomic damages provided by Mo. Rev.Stat. § 538.210[2], and if so, whether the statute provides for one or two such caps in this case.
Plaintiff argues that the entire statutory scheme set forth in §§ 538.205 to 538.230 does not apply to his case. In this regard, plaintiff argues, first, that the United States is not a health care provider under the statute, § 538.205(4). That section defines "health care provider" as:
any physician, hospital, ambulatory surgical center, long-term care facility, dentist, registered or licensed practical nurse, optometrist, podiatrist, pharmacist, chiropractor, professional physical therapist, psychologist, physician-in-training, and any other person or entity that provides health care services under the authority of a license or certificate....
The United States fits within this definition as an "entity that provides health care services under the authority of a license...." The "license" is the Congressional legislation, esp. 38 U.S.C. § 1710, which authorizes the operation of Veterans Administration hospitals.
Next, plaintiff argues that, for the purposes of § 538.210.1, see footnote 2 above, the United States is not a "defendant" as that term is defined by the statute. "Defendant" is defined by § 538.210.2 as:
(1) A hospital as defined in chapter 197 RSMO, and its employees and physician *591 employees who are insured under the hospital's professional liability insurance policy or the hospital's self-insurance maintained for professional liability purposes; (2) A physician, including his nonphysician employees who are insured under the physician's professional liability insurance or under the physician's self-insurance maintained for professional liability purposes; (3) Any other health care provider having the legal capacity to sue and be sued and who is not included in subdivisions (1) and (2) of this subsection, including employees of any health care providers who are insured under the health care provider's professional liability insurance policy or self-insurance maintained for professional liability purposes.
Clearly, the United States is a "health care provider," see pages 590-91 above, which has "the legal capacity to sue and be sued and who is not included in subdivisions (1) and (2)...."
The Court must now consider how many "occurrences" are the subject matter of this action. The term "occurrence" is not defined by the Missouri statute.
The conceded malpractice in this case was pled as two separate claims. Plaintiff argues the first occurred between June 7 and 9, 1988, and was committed by the pathologists, and that the second episode of malpractice occurred on June 24, 1988 and was committed by the surgeons who were different doctors from the pathologists.
The United States has conceded that the conduct of the surgeons was negligent and below the applicable standard of care separate and apart from the negligence of the pathologists which had occurred previously. It is admitted that the surgeons were negligent for proceeding with the surgery of June 24, 1988, whether they were in fact dealing with the squamous cell carcinoma or with a lymphoma. The presence of the second tumor, discovered after the biopsy of June 7, 1988, constituted separate and independent grounds to contraindicate the surgery of June 24, 1988.
While the surgery was initially predicated upon the improper pathology diagnosis, independent and separate events subsequent to the improper pathology diagnosis made the surgery inappropriate and improper. Thus, the improper pathology diagnosis and the improper surgery were two separate occurrences. The Court is permitted to award up to twice the statutory limit on noneconomic damages.
The Supreme Court of Missouri has interpreted § 538.210 as providing multiple caps for a single resulting injury. In Vincent v. Johnson, 833 S.W.2d 859 (Mo.banc.1992), there was a single injurious incident, namely the failure to perform a timely cesarian section, which resulted in brain damage to a newborn child. Among other issues, the court addressed the number of statutory caps to be applied. The court ruled that upon remand, for the correct calculation of a judgment, the trial court was to ascertain whether there were one or two "defendants" within the terms of § 538.210(1). If there were two defendants, then two caps were to be applied notwithstanding a single injury. There was no issue or contention of multiple "occurrences".
There were two separate occurrences of malpractice in this case. First, the defendant has conceded acts of malpractice occurring on different dates by different doctors. Second, the plaintiff's expert, William Robinson, M.D., and the defendant's expert, James Boyd, M.D., testified that the performance of the pathology analysis and report between June 7 and June 9, 1988, was a medical transaction separate from the subsequent surgery of June 24, 1988.
Third, each of those transactions is an independent occurrence of medical malpractice. In Jines v. Young, 732 S.W.2d 938, 944 (Mo.Ct.App.1987), the court held:
Our courts have in recent years held that to make a prima facie case of medical malpractice, a plaintiff must establish three elements: (1) that an act or omission of the defendant failed to meet the requisite medical standard of care; (2) that the act or omission was performed negligently, and (3) that there was a causal connection between the act or omission and the plaintiff's injury.
*592 Each of those elements has been independently established regarding each of the two separate claims in this case.
Plaintiff has sustained severe, extensive, and permanent physical injury as a result of the defendant's separate acts of malpractice, which physical injury has caused plaintiff to suffer: (a) severe, extensive, and continuing pain and suffering; (b) permanent disfigurement; and (c) permanent disability which includes: total or permanent loss of his natural speaking voice; severe respiratory disorder; eating disability with resulting impairment of nutrition; significant shortening of plaintiff's expected life; impaired hearing; and impaired sense of taste and smell.
The proper measure of damages is that amount which would fairly and reasonably compensate plaintiff for his injuries. Sampson v. Missouri Pacific R.R., 560 S.W.2d 573, 588 (Mo. banc 1978). The Court has determined in the findings, above, the amounts which will reasonably compensate plaintiff.
For all damages found by the Court, judgment is entered in favor of plaintiff and against defendant in the sum of $673,000.00.

MEMORANDUM ON MOTION TO AMEND JUDGMENT AND OBJECTIONS TO BILL OF COSTS

Oct. 5, 1994
This action is before the Court upon (1) the motion of the United States under Rule 59(e), Federal Rules of Civil Procedure, for an amendment of the judgment entered on May 2, 1994; and (2) the objections of the United States to the plaintiff's bill of costs. The parties have consented to the exercise of authority by the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c)(3).
Plaintiff Placido L. Romero brought this suit against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 2671 et seq., alleging two instances of negligent medical malpractice against certain physicians employed by the Veterans Administration at the John Cochran Medical Center in St. Louis, Missouri. Following a non-jury trial, the Court entered judgment in favor of plaintiff in the sum of $673,000.00, plus interest and costs.
The United States argues that it is entitled to an amended judgment which (a) applies Missouri law to reduce the noneconomic damages from $600,000.00 to $462,000.00; (b) reduces the economic damages by $41,547.53 as a setoff for Medicare benefits paid to the plaintiff; (c) reduces the economic damages further by the $10,000.00 awarded for lost income; (d) eliminates the award of interest on the judgment; and (e) defines the recoverable costs and the procedure for determining them.
Prior to trial the parties stipulated that the United States is liable for plaintiff Romero's damages which were caused by the negligent misdiagnosis of a tissue biopsy on June 9, 1988, and by the related surgery performed on June 24, 1988. In an opinion, filed on May 2, 1994, the Court found that, as a direct result of the diagnosis of June 9, 1988, and of the medical surgery of June 24, 1988, plaintiff suffered:

(a) Past noneconomic damages: $500,000.00
(b) Future noneconomic damages: 100,000.00
(c) Past economic damages:
 (1) Medical: 53,000.00
 (2) Lost Earnings: 10,000.00
(d) Future economic damages:
 (1) Medical: 10,000.00
 (2) Lost Earnings: 0.00
 ___________
 TOTAL $673,000.00

The Court awarded judgment in the full amount of $673,000.00.
Under the Federal Tort Claims Act, the Court must consider Missouri law in deciding the post-judgment issues raised by defendant. See 28 U.S.C. § 1346(b); Richards v. United States, 369 U.S. 1, 10, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962); Lewis v. United States, 663 F.2d 818, 819 n. 2 (8th Cir.1981).

1. Application of Rev.Stat.Mo. § 538.210.
Defendant first argues that the noneconomic damages of plaintiff must be reduced to $462,000, which the parties agreed was the cap applicable under Mo.Rev.Stat. § 538.210.1 to plaintiff's claims for such damages. The Court originally concluded that the Missouri statute provided for two such caps in this case, because the facts of the case involved two occurrences of negligence. *593 It is with this conclusion that the United States takes issue.
The relevant statute provides:
In any action against a health care provider for damages for personal injury or death arising out of the rendering of or the failure to render health care services, no plaintiff shall recover more than [the stated sum] per occurrence for noneconomic damages from any one defendant as defendant is defined in subsection 2 of this section.
Mo.Rev.Stat. § 538.210.1 (1986). In its original opinion the Court determined that the United States was the only defendant in this action, as the term "defendant" was defined by the Missouri statute. The Court, however, determined that there were two "occurrences," of negligence, each of which contributed to cause plaintiff's damages and each of which could support the award of an individual statutory damages cap. See Opinion, filed May 2, 1994, pp. 590-91; see also Brown v. Kneibert Clinic, 871 S.W.2d 2, 4 (Mo.Ct.App.1993).
The issue presented by this case, whether the facts indicate one or more statutory "occurrences," is one of first impression. The term "occurrence" as used in § 538.210.1 is not defined by Missouri statute and the Court has found no Missouri court opinion which specifically interprets the term in the context of § 538.210.1.
The United States argues that the term "refers to the injury occurrence" and that there was but one injury occurrence, that which resulted from the surgery of June 24, 1988. See Defendant's Motion and Memorandum, filed May 11, 1994, p. 4.
The Court disagrees with the United States that the proper construction of "occurrence" in § 538.210.1 is limited to the single occurrence of the physical injury in this action. The common technical usage of "occurrence" in Missouri state judicial proceedings refers to a singular wrongful act sued upon, not to the receipt of injury by the plaintiff. E.g., Mo.S.Ct.R. 52.05(a); State ex rel. Farmers Insurance Company, Inc. v. Murphy, 518 S.W.2d 655, 660 (Mo. en banc 1975); Smith v. Courter, 575 S.W.2d 199, 204-205 (Mo.Ct. App.1978); State ex rel. Blond v. Stubbs, 485 S.W.2d 152, 154 (Mo.Ct.App.1972); cf., Mo. Rev.Stat. § 516.105 (prescribing that judicial actions for medical malpractice "be brought within two years from the date of the occurrence of the act of neglect complained of...."). The Missouri legislature must be presumed to have known the common legal usage of technical, but undefined, terms included in its legislation. See Bartareau v. Executive Business Products, Inc., 846 S.W.2d 248, 249 (Mo.Ct.App.1993).
The fact that plaintiff may not have suffered physical injury until the June 24 surgery, does not detract from the fact that this injury resulted from two separate, suable occurrences of negligent acts. Brown v. Kneibert Clinic, 871 S.W.2d 2, 3 (Mo.Ct.App. 1993).
Therefore, the Court will not reduce plaintiff's noneconomic damages to one statutory maximum of $462,000.00.

2. Plaintiff's economic damages.
The United States argues that the judgment for $63,000 in economic damages must be reduced by $41,547.53, the amount which plaintiff agrees was paid for medical services by the United States through Medicare. The government's entitlement to a setoff for the amount paid by it through Medicare is governed by the substantive law of Missouri. Manko v. United States, 830 F.2d 831, 836 (8th Cir.1987). Under Missouri law, plaintiff may take advantage of the collateral source rule and avoid a setoff for the Medicare payments, if the Medicare payments came from a source wholly independent of the liable party in this action or if plaintiff proved that he contributed to the Medicare fund which paid for medical services provided to plaintiff. Overton v. United States, 619 F.2d 1299, 1306-8 (8th Cir. 1980); Manko, 830 F.2d at 836-7.
Plaintiff is not entitled to the application of the collateral source rule in this action. The Medicare payments were made by the same entity plaintiff is seeking to recover against, the United States. Plaintiff has not proven that he contributed to the Medicare fund whence the payments came. His failure to prove his contribution requires that the *594 Medicare payments be setoff against his recovery. Overton, 619 F.2d at 1305-1306.

3. Plaintiff's lost earnings.
The United States argues that the Court's finding that plaintiff lost earnings in the sum of $10,000 is without evidentiary support. The Court disagrees. See deposition of Wayne Gardenswartz, which was offered at trial.

4. Post-judgment interest.
The United States argues that it is not required to pay post-judgment interest, unless it appeals the Court's judgment and loses on appeal. The Court agrees. See 31 U.S.C. § 1304.
For the reasons set forth above, the motion of the United States for an amendment of the judgment is sustained. An amended judgment is entered herewith as follows:

(a) Past noneconomic damages: $500,000.00
(b) Future noneconomic damages: 100,000.00
(c) Past economic damages:
 (1) Medical: 53,000.00
 less Medicare payments: 41,547.53
 total: 11,452.47
 (2) Lost Earnings: 10,000.00
(d) Future economic damages:
 (1) Medical 10,000.00
 (2) Earnings: 0.00
 ___________
 Total Damages: $631,452.47

5. Defendant's objections to the bill of costs.
Plaintiff has filed a bill of costs seeking a total of $25,170.48 in costs. In the application of Fed.R.Civ.P. 54(d) and 28 U.S.C. § 1920, the Court must carefully scrutinize the claimed costs and the support offered for them. Farmer v. Arabian American Oil Co., 379 U.S. 227, 232-233, 235, 85 S.Ct. 411, 415, 13 L.Ed.2d 248 (1964); Alexander v. National Farmers Organization, 696 F.2d 1210, 1212 (8th Cir.1982); cert. denied, 461 U.S. 937, 103 S.Ct. 2108, 77 L.Ed.2d 313 (1983); Davis v. Parratt, 608 F.2d 717, 718 (8th Cir.1979); Koppinger v. Cullen-Schiltz & Associates, 513 F.2d 901, 911 (8th Cir. 1975).
The United States first argues that the $50.00 in fees charged by the Clerk of the Court to two of plaintiff's counsel for admission pro hac vice under the Court's local rule are not recoverable. The Court agrees. Such fees are an expense of counsel for the privilege of practicing law in this Court. Such expenses are not normally charged to a fee-paying client. Northcross v. Board of Education, 611 F.2d 624, 639 (6th Cir.1979), cert. denied, 447 U.S. 911, 100 S.Ct. 2999, 3000, 64 L.Ed.2d 862 (1980), and are not recoverable under Rule 54(d) or 28 U.S.C. § 1920(1).
The United States argues that plaintiff may not recover the costs of the depositions of Drs. Naidu and Sunwoo (government pathologists), Thawley (government surgeon), Mohapatra and Chung (government pathologists), Warren (government surgeon), Nagorski (government surgeon), and Bauer (government pathologist) whose testimony, the government argues, was obtained for discovery purposes only. The government also objects to the costs of the depositions of Dr. Heffner, whose trial testimony was objected to by the government, and which was assertedly obtained only for discovery purposes.
The government's objections are without merit. Generally, the expenses of taking depositions which are not used at trial are not taxable as costs, unless they were reasonably necessary to the case and not purely for investigative purposes. E.g., Koppinger v. Cullen-Schiltz & Associates, 513 F.2d at 911. In this case, the information learned from these witnesses in deposition preceded the government's decision not to contest the issues of negligence and liability but to try the case on damages only. Therefore, the Court will allow the claimed deposition costs of the physicians, $3,442.90.
The Court will not allow the recovery of the costs of the transcripts of the depositions of plaintiff and his daughter, Angie Lozano, both of whom testified at trial. These depositions were not reasonably necessary to the case.
The government objects to the $18,945.72 claimed by plaintiff as expert witnesses' fees. The Court agrees with the government that only the statutory witness fees and per diem and transportation costs of these witnesses is recoverable. See Crawford Fitting Co. v. J. *595 T. Gibbons, Inc., 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987). This rule also applies to the expert fees claimed for Arthur E. Smith, Ph.D., and Henry D. Chu, M.D. These costs will not be allowed in excess of $821.72.
The Court disagrees with the United States that the costs of copying medical records for the use of expert witnesses are not recoverable. These medical records were necessarily obtained for use in the case; had the government not admitted liability, these documents would likely have been offered into evidence at trial. 28 U.S.C. § 1920(4). Therefore, the Court will allow the $365.70 claimed for this purpose.
The Court agrees with the government that the costs incurred by plaintiff's counsel in attending deposition proceedings are not recoverable, because extraordinary circumstances were not involved. Hollenbeck v. Falstaff Brewing Corp., 605 F.Supp. 421, 439 (E.D.Mo.1984).
Finally, the United States objects to the total of $355.00 for the production and courtroom presentation of the video exhibit which depicted "A Day in the Life of Mr. Placido Romero [(the plaintiff)]." At trial, the government objected to the admission of the video tape. The Court, however, admitted the exhibit, No. 24, as a demonstration of plaintiff's abilities and impairments, while sustaining the government's hearsay objection to plaintiff's recorded statements of facts. This exhibit was an admissible method of displaying relevant information. This expense will be approved. Rosebrough Monument Co. v. Memorial Park Cemetery Association, 572 F.Supp. 92, 94 (E.D.Mo.1983).
An appropriate order is issued herewith.

ORDER
In accordance with the Memorandum filed herewith,
IT IS HEREBY ORDERED that the motion of the defendant for an amended judgment is sustained in that plaintiff Placido L. Romero have and recover from defendant United States of America the sum of $631,452.47, plus the costs of the action.
IT IS FURTHER ORDERED that the objections of the defendant to the bill of costs filed by the plaintiff are sustained in part and denied in part. In accordance with the Memorandum filed herewith, plaintiff shall file an amended bill of costs for defendant to pay.
NOTES
[1] No evidence of other income was offered for the period after 1982.
[2] Section 538.210.1 provides:

In any action against a health care provider for damages for personal injury or death arising out of the rendering of or the failure to render health care services, no plaintiff shall recover more than three hundred fifty thousand dollars per occurrence for noneconomic damages from any one defendant as defendant is defined in subsection 2 of this section.
Subsection 4 of § 538.210 provides for an increase or decrease in this amount according to the prescribed inflation index. The parties agree that the applicable cap in this case is $462,000.00.