Matthew SCOTT, et al.,
Plaintiffs/Respondents,

v.

SSM HEALTHCARE ST. LOUIS,
et al., Defendants/Appellants.

No. ED 79240.

Missouri Court of Appeals,
Eastern District,
Division Three.

Jan. 29, 2002.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 13, 2002.

Application for Transfer Denied
April 23, 2002.

David G. Ott, Thomas B. Weaver, Cynthia Sciuto, Armstrong Teasdale, LLP, St. Louis, MO, for defendants/appellants.

W.T. Nolan, Michael D. Stokes, Devereaux, Stokes, Nolan, Rutledge & Fernandez, St. Louis, MO, for plaintiffs/respondents.

RICHARD B. TEITELMAN, Judge.

Defendant SSM Healthcare St. Louis, d/b/a St. Joseph's Health Care Center in St. Charles ("Hospital") appeals from the judgment in the action of plaintiffs Matthew Scott and his mother, Josephine Scott, against Hospital for medical malpractice. Plaintiffs' claims against Hospital asserted vicarious liability based on the conduct of one of its employees, Dr. Aziz Doumit, and the conduct of Dr. Richard Koch, a radiologist not employed by Hospital but who was found by the jury to be an agent of Hospital. Before trial, plaintiffs settled with Dr. Koch and his employer, Radiologic Imaging Consultants ("RIC"). On appeal, Hospital argues that the trial court erred in (1) failing to rule that the evidence was insufficient to support the jury's finding of agency as to Dr. Koch; (2) failing to apply § 538.230 RSMo (2000),[1] rather than § 537.060, as the method for reducing the jury verdict to take into account the settlement with Dr. Koch; (3) allowing the application of more than one statutory damage cap for non-economic damages against Hospital pursuant to § 538.210; (4) denying Hospital's remittitur motion on the damages awarded to Josephine Scott; (5) admitting certain

---

1. All further statutory references are to RSMo (2000) unless otherwise noted.

expert testimony; and (6) calculating damages. We affirm.

## BACKGROUND

In 1994 Matthew Scott, then seventeen, sustained serious injuries as a result of a sinus infection that spread into his brain. Matthew was involved in a car accident and was taken to Hospital, where he was treated for minor injuries and released to his father. Two days later Matthew returned to Hospital's emergency room, complaining of a severe headache. Dr. Doumit was Hospital's emergency room physician who examined Matthew that day. Soon after Matthew arrived, a CT scan of his head was conducted. Dr. Richard Koch, a partner in RIC, read the CT film and concluded that the CT scan was normal. Matthew was diagnosed as having a mild concussion from the previous auto accident, was given medication for his headache and sent home.

The next day, Matthew's headache had not improved. His parents called Hospital three times and informed Dr. Doumit that Matthew was lethargic, nauseous and vomiting. Dr. Doumit told them that he was still exhibiting signs of a minor concussion, that he would probably improve within a few days, that they should continue to observe him, but that if they became very concerned about his condition they could bring him back to the emergency room.

Early the next morning, Matthew collapsed in the kitchen, unable to use the right side of his body. He was rushed by ambulance to Barnes Hospital in St. Peters, Missouri. A spinal tap and CT scan revealed an infection at the top of his brain, and his brain was swelling inside his skull. Matthew was taken to Barnes Hospital in St. Louis, where a number of surgeries were performed to remove infected brain tissue and portions of his skull. He remained in a coma for several weeks.

Eventually, after undergoing skull reconstructive surgery and an extensive program of rehabilitation, Matthew was able to achieve a considerable recovery. He also has sustained serious permanent injuries, however, including among others a significant degree of paralysis on the right side of his body, and the requirement of a permanent ventricular drainage tube in his brain.

Matthew and his mother filed this medical malpractice action against Hospital and others, alleging, *inter alia,* that the negligence of Dr. Doumit and Dr. Koch caused Matthew's injuries. Specifically, plaintiffs alleged that Dr. Koch had acted below the accepted standard of care in misreading the initial CT scan on September 24, and that Dr. Doumit had acted below the standard of care by failing to instruct Matthew's parents, when they called with their concerns, to bring him back to the emergency room. Plaintiffs' suit further alleged that at all relevant times Dr. Koch had been acting as an agent for Hospital, notwithstanding the fact that he was formally employed by RIC, which had contracted to provide radiology services at Hospital. Plaintiffs' action also named Dr. Koch and RIC as defendants. Before trial, plaintiffs settled their claims against Dr. Koch and RIC for the sum of $624,800 (hereinafter, "the Koch settlement"). The case then proceeded to trial against Hospital.

At trial, substantial evidence and the testimony of expert witnesses, including among others radiologists, an infectious disease specialist and the neurosurgeon who treated Matthew at Barnes, supported plaintiffs' allegations of medical negligence.[2]

---

2. This testimony supported, *inter alia,* that the

CT images which Dr. Koch read on Septem-

The jury found in plaintiffs' favor. It further found that Dr. Koch was Hospital's agent. It assessed Matthew's total damages at $4,445,000, apportioned as follows: $80,000 for past economic damages; $500,000 for past non-economic damages; $600,000 for future medical damages; $1,265,000 for future economic damages excluding future medical damages; and $2,000,000 for future non-economic damages. Josephine Scott's separate damages, all past economic, were assessed by the jury at $500,000. The jury found that Hospital was 25% at fault for the injuries based on the negligence of Dr. Doumit and 75% at fault based on the negligence of Dr. Koch, and that plaintiffs were 0% at fault.

After the verdict, the parties filed various post-trial motions. Hospital's motions sought, *inter alia*, to have the court determine that only a single statutory cap on non-economic damages applied to Hospital pursuant to § 538.210, and to have the verdict decreased by the percentage of fault (75%) that the jury apportioned to Dr. Koch, pursuant to § 538.230.

In response to the parties' motions, the trial court entered an amended judgment with accompanying explanatory order. The amended judgment reflected several categories of express findings by the court:

### 1. General

Citing §§ 538.210, 538.230 and 567.060, the court made the general finding that it was required to "enter an appropriate [amended] judgment taking into account equitable shares based on the percentage of fault found by the jury, and taking into account the settlement by Koch as well as the statutory cap on non-economic damages."

### 2. Applicable Number of Caps on Non–Economic Damages

The court determined that the applicable number of statutory non-economic damage caps in plaintiffs' case, pursuant to § 538.210, was two. The court found that "there were two separate occurrences of malpractice in the instant case, each of which contributed to cause [Matthew's] injuries ... and each of which could support the application of a statutory damage cap." Specifically, the court found the two occurrences to be that "Dr. Koch misread the CT film" on September 24 and "Dr. Doumit failed to examine and failed to advise that Matthew return to the Hospital" on September 25. The court thus found that plaintiffs were entitled to recover total non-economic damages of $1,056,000 ($528,000 × 2).[3]

### 3. Matthew Scott v. Hospital Based on Negligence of Dr. Doumit

Next, the court found that Matthew had a derivative claim against Hospital based on the negligence of Dr. Doumit, and that Hospital would be vicariously liable for any amount for which Doumit was deemed liable based on his own negligence. The court determined that it was required by §§ 538.230 and 538.210 to (1) reduce both the economic and non-economic damages to Dr. Doumit's equitable share, and then (2) apply the statutory cap to the non-

ber 24 indicated Matthew had a sinus infection on that date which was still confined to his sinuses; that Dr. Koch negligently misread the CT scan film when he interpreted it as showing no abnormality; that Dr. Doumit had acted negligently in failing to instruct Matthew's parents to bring him back to the emergency room when they repeatedly called

him with their concerns on September 25; and that Matthew would not have developed the brain infection if he had been given antibiotics by Sunday evening, September 25.

**3.** The parties stipulated that the amount of the applicable non-economic damages cap was $528,000.

economic damages. Accordingly, the court found that 25% of Matthew's total economic damages was $486,250 and that 25% of Matthew's total non-economic damages was $625,000, but then reduced the latter amount down to the non-economic damage cap of $528,000. The court thus determined that Hospital was liable to Matthew in the amount of $1,014,250 ($486,250 + $528,000) based on the conduct of Dr. Doumit.

### 4. Matthew Scott v. Hospital Based on Negligence of Dr. Koch

Next, the court determined that Matthew similarly had a derivative claim against Hospital based on the negligence of Dr. Koch. The court found that this claim must (1) be reduced to reflect Dr. Koch's equitable share of fault, and then (2) given a proper offset for the Koch settlement pursuant to § 537.060. (That is, the court found that Hospital was entitled to a set-off, for the Koch settlement, against the amount that it was liable to Matthew based on Dr. Koch's negligence.) The court determined that Dr. Koch's 75% equitable share of Matthew's total econom-

ic damages was $1,458,750, and likewise that his equitable share of Matthew's total non-economic damages was $1,875,000. The court next determined that, in order to properly calculate set-off amounts, it must both (a) "allocate the Koch settlement between economic and non-economic damages based on the relationship between these two elements as found by the jury," [4] and then (b) "since the settlement was with both Matthew and Josephine Scott, and since all of the damages awarded to Josephine were economic, the court must also allocate the economic portion of the set-off as between Matthew and Josephine." [5]

After making these calculations, applying Matthew's share of the economic portion of the Koch settlement as a set-off against Koch's 75% share of Matthew's economic damages,[6] applying the non-economic portion of the Koch settlement as a set-off against Koch's 75% share of Matthew's non-economic damages,[7] then applying the statutory non-economic damages cap, the court determined that Hospital was liable to Matthew based on the con-

**4.** The court calculated that the non-economic damages found by the jury represented 50.56% of the total damages awarded to both plaintiffs, and the economic damages 49.44%. The Koch settlement amount was $624,800. The court thus found that 50.56% of the settlement, representing the non-economic portion, was $315,874.62, and that 49.44%, representing the economic damages portion of the settlement, was $308,952.38.

**5.** The total economic damages awarded by the jury to both plaintiffs was $2,445,000. The court calculated that the $500,000 in economic damages awarded to Josephine Scott represented 20.45% of that total, and that the $1,945,000 in economic damages awarded to Matthew represented 79.55% of the total. The economic portion of the Koch settlement allocable to Matthew was therefore found to be $245,750.46 (which is $308,925.38 × 79.55%). Similarly, the eco-

nomic portion of the Koch settlement allocable to Josephine was found to be $63,147.92 ($308,925.38 × 20.45%).

**6.** Dr. Koch's 75% equitable share of Matthew's jury-awarded economic damages was found to be $1,458,750. That amount, less the set-off of $245,750.46 representing the economic portion of the Koch settlement allocable to Matthew, equals $1,212,999.54.

**7.** Dr. Koch's 75% equitable share of Matthew's jury-awarded non-economic damages was $1,875,000. The court then determined that $315,874.62, representing the non-economic damages portion of the Koch settlement, must be set off against that amount, leaving a total $1,559,125.38 for which Hospital was liable to Matthew in non-economic damages based on the negligence of Koch. That amount was then reduced to the statutory non-economic damages cap, $528,000.

duct of Dr. Koch for $1,212,999.54 in economic damages and $528,000 in non-economic damages, or a total amount of $1,740,999.54.

The court thus determined that Matthew was entitled to a total judgment against Hospital, based on the negligence of both Dr. Doumit and Dr. Koch, in the amount of $2,755,249.54 (Doumit $1,014,250 + Koch $1,740,999.54).

### 5. Josephine Scott's Claim for Economic Damages

Lastly, the trial court's amended judgment found Josephine Scott to be entitled to a total judgment of $436,285.08 from Hospital. This sum was derived by subtracting the sum of $63,174.92, (the amount of the set-off for the economic portion of the Koch settlement found to be allocable to Josephine), from the $500,000 in economic damages that the jury awarded her.

The amended judgment became final, and Hospital now appeals. Further facts will be recited where necessary to our analysis of the points raised on appeal.

### DISCUSSION

### 1. Sufficiency of Evidence on Issue of Dr. Koch's Agency

In its first point on appeal, Hospital asserts that the trial court erred in denying its motions for directed verdict and for judgment notwithstanding the verdict on the issue of whether Dr. Koch was Hospital's agent. Hospital argues that plaintiffs failed to make a submissible case on that issue, because there was no evidence either that Hospital consented to Dr. Koch acting on its behalf or that it controlled or had the right to control his work performance. Thus, Hospital claims, it cannot be liable for Dr. Koch's actions, because the only reasonable conclusion supported by the evidence is that "Dr. Koch worked at [Hospital] as an independent contractor

supplied by RIC." In assessing this claim of error, we view the evidence and inferences in the light most favorable to plaintiffs, disregarding all contrary evidence. *Coonrod v. Archer Daniels–Midland Co.*, 984 S.W.2d 529, 533 (Mo.App. E.D.1998).

"An independent contractor is one who contracts with another to do something for him but is neither controlled by the other nor subject to the other's control with respect to his physical conduct in the performance of the undertaking." *Lange Co. v. Cleaning By House Beautiful*, 793 S.W.2d 869, 871 (Mo.App. E.D. 1990). "As a general rule, a party who contracts with an independent contractor is not liable for the negligent acts of the independent contractor." *Kelly v. St. Luke's Hospital of Kansas City*, 826 S.W.2d 391, 394 (Mo.App. W.D.1992). In contrast to the rule on independent contractors, the doctrine of *respondeat superior* imposes upon an employer vicarious liability for the negligent acts or omissions of his employee or agent that are committed within the scope of the employment or agency. *Bargfrede v. American Income Life Ins. Co.*, 21 S.W.3d 157, 161 (Mo.App. W.D.2000). "Generally, the relationship of principal-agent or employer-employee is a question of fact to be determined by the jury when, from the evidence adduced on the question, there may be a fair difference of opinion as to the existence of the relationship." *Id.*

Two elements are required to establish an agency relationship: (1) the principal must consent, either expressly or impliedly, to the agent's acting on the principal's behalf, and (2) the agent must be subject to the principal's control. *Wray v. Community Health Center*, 901 S.W.2d 167, 170 (Mo.App. W.D.1995). In the context of a hospital-physician relationship, the primary focus is on whether the hospi-

tal generally controlled, or had the right to control, the conduct of the doctor in his work performed at the hospital. *Brickner v. Normandy Osteopathic Hospital*, 746 S.W.2d 108, 115 (Mo.App. E.D.1988). See also, Annotation, *Liability of Hospital or Sanitarium for Negligence of Physician or Surgeon*, 51 A.L.R.4th 235, 1987 WL 419596 (1987). Additionally, our courts have also cited with approval a list of ten factors set forth in the Restatement (Second) of Agency, § 220(2) (1958), as a helpful aid in "determining whether one acting for another is a servant or an independent contractor." [8] See *Keller v. Missouri Baptist Hospital*, 800 S.W.2d 35, 38 (Mo.App. E.D.1990).

■ In the case at hand, Hospital cites a handful of facts from the record which, arguably, could support the conclusion that RIC and Dr. Koch were acting as independent contractors rather than as agents of Hospital. Among them are: the relationship between Dr. Koch and Hospital was based upon a written contract, in which RIC agreed to provide radiology services to Hospital; RIC was a partnership, of which Dr. Koch was a partner and signatory to the contract; Hospital did not employ or pay Dr. Koch (RIC did); Hospital did not directly set Dr. Koch's hours at the Hospital; and Hospital did not bill patients for the services of Dr. Koch or the other RIC radiologists.

■ However, a jury question is presented when the evidence is sufficiently conflicting that reasonable minds could differ as to whether agency existed. *Bargf-*

*rede*, 21 S.W.3d at 162. The following evidence, all of it from the contract and/or testimony in the record, supports finding a principal-agent relationship between Hospital and Dr. Koch: (1) Hospital establishes the medical standards for the provision of radiological services at Hospital; (2) Hospital determines the qualifications necessary for Dr. Koch; (3) Hospital has the right to require Dr. Koch to submit reports regarding radiological services rendered according to standards established by Hospital; (4) Hospital sets the prices for Dr. Koch's services, and those prices cannot be changed without prior approval of Hospital; (5) Hospital required that Dr. Koch be "an active member" of Hospital's medical staff; (6) Hospital required that Dr. Koch maintain liability insurance in specific amounts; (7) in the event that Dr. Koch fails to procure such insurance, Hospital has the right to procure it for him at his expense; (8) Hospital has the right to terminate Dr. Koch if dissatisfied with his performance; (9) Hospital provides all nurses and technicians for the radiology department; (10) Hospital owns and provides all of the office space for the radiology department, as well as providing all of the radiology equipment, films, supplies and fixtures; (11) Hospital decides what type of film, film boxes and view jackets will be used; (12) the contract between Hospital and RIC is of infinite duration; (13) RIC has provided the only radiologists working at Hospital for over 60 years; (14) RIC exclusively provides all of the radiologists for Hospital, including even the doctor who serves as the administrative director of the radiol-

8. Fundamentally, there is no distinction to be drawn between the liability of a principal for the tortious act of his agent, and the liability of an employer ("master") for the tortious act of his employee ("servant"). See 3 Am Jur 2d *Agency* § 280 (1986). This is especially true in the context of a hospital-physician relationship; there, the principal is subject to liability for physical harm caused to another by the negligence of a physician agent who is not its servant, where the hospital is under a duty to use care to protect its patients and confides the performance of that duty to the agent. See Restatement (Second) of Agency, § 251(a) (1958).

ogy department; and (15) the RIC radiologist who was the director of the radiology department testified that he considered himself and the other RIC radiologists at Hospital to in effect be "employees of the hospital."

■ Despite these facts, Hospital argues that the evidence at trial was insufficient to establish agency because there was nothing in the record to show that Hospital controlled Dr. Koch specifically "in the performance of the act at the heart of plaintiffs' claim—his alleged negligent reading of Matthew Scott's CT scan." However, Missouri courts have long recognized that physicians must be free to exercise independent medical judgment; the mere fact that a physician retains such independent judgment will not preclude a court, in an otherwise proper case, from finding the existence of an employer-employee or principal-agent relationship between a hospital and physician. See *Keller v. Missouri Baptist Hospital,* 800 S.W.2d at 37 and 38; *Brickner v. Normandy Osteopathic Hospital,* 746 S.W.2d at 115. Courts in other states, as well, have strongly rejected the notion that such a relationship cannot be found merely because the hospital does not have the right to stand over the doctor's shoulder and dictate to him or her how to diagnose and treat patients. See discussion at *Reynolds v. Swigert,* 102 N.M. 504, 697 P.2d 504, 508 (N.M.App.1984); *Edmonds v. Chamberlain Memorial Hospital,* 629 S.W.2d 28, 30–31 (Tenn.App.1981).

In, view of the foregoing principles of law, the evidence in this case and our standard of review, the trial court did not err in finding the evidence sufficient to present a jury question on the issue of Dr. Koch's agency. Point I is denied.

## 2. Applicability of § 538.230

For its second point on appeal, Hospital urges that the trial court erred in failing to reduce the verdict by 75% to credit the Koch settlement because § 538.230 is applicable and requires such a result.

That statute addresses the effect of a settlement by one of several defendants in a medical malpractice case. Generally, it provides that non-settling defendants who go to trial are entitled to have a judgment against them reduced by the percentage of fault allocated to a settling party. See *Hewlett v. Lattinville,* 932 S.W.2d 910, 911 (Mo.App. E.D.1996). The crucial statutory language relied upon by Hospital states:

> ... [T]he claim of the releasing person against other persons or entities is reduced by the amount of the released persons' or entities' equitable share of the total obligation imposed by the court pursuant to a full apportionment of fault under this section as though there had been no release.

§ 538.230.3. In contrast, § 537.060, the settlement statute that applies generally in tort cases, provides that a non-settling defendant is entitled only to a dollar-for-dollar set-off for amounts paid by a settling defendant.

In the present case, Hospital's post-trial motion argued that § 538.230 was applicable and requested that the trial court reduce the judgment in favor of plaintiffs by 75%, the percentage of fault that the jury apportioned to Dr. Koch. The court, relying in part upon the holding in *Glidewell v. S.C. Management, Inc.,* 923 S.W.2d 940 (Mo.App. S.D.1996), denied that request. The court found instead that § 537.060 was applicable and, accordingly, reduced the judgment against Hospital by the dollar amount of the Koch settlement. Hospital asserts that this ruling was error, arguing that under the express language of § 538.230, because Dr. Koch had settled with plaintiffs and because the jury appor-

tioned 75% of the fault to him, it was entitled to a 75% reduction in the amount of the verdict and judgment.

■ We disagree. The jury found both Dr. Doumit and Dr. Koch to be agents of Hospital. As a result, there is but a single judgment against a single defendant—Hospital. Under these circumstances and the principle of vicarious liability, Hospital is completely liable for the negligence of its agents, and thus is not entitled to a reduction in the verdict against it based on any apportionment of fault between the principal and its agents. See *Glidewell v. S.C. Management, Inc.*, 923 S.W.2d at 946.

Hospital urges us to find that *Glidewell* is inapposite because in that case there was only a single physician involved and the jury was not given an apportionment-of-fault instruction. In contrast, Hospital argues, the jury was allowed to assess percentages of fault in the instant case, and therefore § 538.230 must be deemed applicable.

This argument is unpersuasive. It ignores both the primary reason that an apportionment-of-fault instruction needed to be given in this case, as well as the legal effect of the jury's determination that Dr. Koch was Hospital's agent. The jury not only had to decide whether either or both . Dr. Doumit and Dr. Koch were negligent, and if so whether their negligence caused or contributed to Matthew's injuries; it also had to decide whether Dr. Koch was Hospital's agent. Because agency was a jury question, the instructions and general verdict form necessarily had to give the jury the opportunity to find that Dr. Koch was *not* an agent of Hospital. If he was found not to be an agent, the trial court would need to know what his percentage of fault might be—because in that case he would have been an independent tortfeasor for whom Hospital was not responsible, and then § 538.230 would have applied to the Koch settlement.

The jury found, however, that Dr. Koch was an agent. As a result, Hospital is completely liable for the negligence of both of its agents, Dr. Doumit and Dr. Koch. *Glidewell*, 923 S.W.2d at 946. Under these circumstances, the trial court did not err in holding that § 538.230 was inapplicable and that Hospital was instead entitled to a dollar-for-dollar set-off of the Koch settlement pursuant to § 537.060. Point II is denied.

*3. Applicable Number of Statutory Caps on Non-economic Damages*

In its post-trial motion Hospital argued that, pursuant to § 538.210, the non-economic damages assessed against it were confined to a single monetary limit ("cap") of $528,000. The trial court disagreed and held that two caps applied under the facts of the case because there were two separate and distinct occurrences of malpractice. In Point III, Hospital contends the trial court erred and misapplied the statute in finding that two damage caps were applicable under § 538.210, because "the statute permits only one damage cap per defendant in a malpractice case, and [Hospital] was a single defendant."[9] Section 538.210.1 provides:

---

9. There is no question that Hospital is a single "defendant," as defined in § 538.210.2(1). Further, since the parties do not dispute that Hospital's professional liability insurance policy covered Dr. Doumit, and that the same policy also covers Hospital for any liability based on the actions of Dr. Koch if Dr. Koch were found to be Hospital's agent, there is only one defendant in the entire case for purposes of determining the statutory limit on non-economic damages. See *Vincent by Vincent v. Johnson*, 833 S.W.2d 859, 864 (Mo. banc 1992). *Vincent* did not decide, however, whether a defendant hospital could be liable

In any action against a health care provider for damages for personal injury or death arising out of the rendering of or the failure to render health care services, no plaintiff shall recover more than three hundred fifty thousand dollars per occurrence for noneconomic damages from any one defendant as defendant is defined in subsection 2 of this section.[10]

Thus, the issue we are presented with is purely one of statutory interpretation: what is the meaning of "occurrence" as used in § 538.210? The term is not defined in the statute itself, and no Missouri case has construed the meaning of "occurrence" as used therein. Hospital argues that "occurrence" as used in this context refers to the death or injury sustained by a decedent or plaintiff. Respondents, on the other hand, argue that "occurrence" refers to an act of medical negligence that contributes to cause the individual's death or injury. If Hospital's interpretation is correct then the trial court necessarily erred, since the parties agree Matthew suffered one indivisible injury as a result of Hospital's acts of negligence.

When construing a statute, a court must endeavor to ascertain the intent of the legislature from the words used and, if possible, give effect to that intent. *Abrams v. Ohio Pacific Express*, 819 S.W.2d 338, 340 (Mo. banc 1991); *Martinez v. State*, 24 S.W.3d 10, 16 (Mo.App. E.D.2000). The words should be considered in their plain and ordinary meaning; and if the language of the statute is unambiguous, there is nothing for us to construe. *Abrams*, 819 S.W.2d at 340. In

this case, the meaning of "occurrence" as used in the context of § 538.210.1 is not clear and unambiguous; reference to standard English dictionaries reveals that the term could plausibly be interpreted as referring either to the harm a plaintiff has sustained or to an act of medical neglect causing that harm. We therefore must construe the statutory meaning, and may properly resort to rules of construction to aid in doing so. *Abrams*, 819 S.W.2d at 340.

Statutes may be considered with reference to their historical background. *Martinez v. State*, 24 S.W.3d at 17. Our Supreme Court has stated, in *Mahoney v. Doerhoff Surgical Services* 807 S.W.2d 503, 507 (Mo. banc 1991), that it is "readily understood from the history and text of Chapter 538 that the enactment is a legislative response to the public concern over the increased cost of health care and the continued integrity of that system of essential services." See also *Budding v. SSM Healthcare System*, 19 S.W.3d 678, 680 (Mo. banc 2000). But while we must recognize that the fundamental policy behind Chapter 538 was to temper high costs of health care, in part by means of limiting the liability of health care providers for non-economic damages caused by their acts of medical malpractice, we must also recognize that acknowledging that purpose does not necessarily resolve the precise issue now before us. The question is not whether the legislature intended by § 538.210 to limit health care providers' liability for non-economic damages; the question, rather, is *to what extent* and *in what manner* did they intend to limit such

---

to a plaintiff for two non-economic damage caps based on two separate acts of negligence by its agents.

10. This cap changes annually based upon "the Implicit Price Deflator for Personal Consumption Expenditures as published by the

Bureau of Economic Analysis of the United States Department of Commerce." § 538.210.4. The trial court applied the cap amount of $528,000, which the parties stipulated was the correct cap for the year 2000.

liability? The issue of construing the meaning of "occurrence" within the statute must be seen in that light.

Although no Missouri case is directly on point, the federal district court in *Romero v. U.S.*, 865 F.Supp. 585 (E.D.Mo.1994), has addressed this issue. There, in interpreting the relevant language of § 538.210, the court held that application of two separate damage caps is appropriate when there are two separate and distinct "occurrences" of medical malpractice that contribute to cause the plaintiff's injuries. *Id.* at 593. Specifically rejecting the contention that "occurrence" as used in the statute meant death or injury, the court in *Romero* noted that the common legal "usage of 'occurrence' in Missouri state judicial proceedings refers to a singular wrongful act sued upon, not to the receipt of injury by the plaintiff." *Id.* See also the medical malpractice statute of limitations, § 516.105, which equates the term "occurrence" with "the act of neglect complained of."

█ While we acknowledge an apparent split of authority on this issue in those few instances where the same or similar question has arisen in other jurisdictions,[11] we find the court's analysis in *Romero* to be persuasive. We further note that if Hospital's proffered statutory interpretation was correct, so that only one damage cap per defendant always applied in a malpractice case no matter how many separate occurrences of medical malpractice by a single defendant caused the plaintiff's

injuries, the clearest and most unambiguous way for the legislature to have expressed such an intent would have been to simply leave the words "per occurrence" out of the statute entirely. If that had indeed been the legislative intent, then using the words "per occurrence" would amount to mere surplusage which added nothing at all to the intended statutory meaning. We presume that the legislature did not insert superfluous language in a statute. *Rich v. Peters*, 50 S.W.3d 814, 819–820 (Mo.App. W.D.2001). Point III is denied.

### 4. Denial of Hospital's Motion for Remittitur on Damages Awarded to Josephine Scott

█ In its fourth point, Hospital alleges the trial court erred in denying its motion for remittitur because the evidence did not support the jury's award to Matthew's mother of $500,000 in economic damages. The record reveals that there was evidence of over $372,000 in bills for medical services rendered to Matthew. Substantial evidence supported both that the charges for these services were reasonable, and that the services were medically necessary to treat Matthew's condition. Additionally, there was evidence at trial that Mrs. Scott incurred substantial expenses in establishing a household fit for occupation by Matthew in his disabled condition. The evidence in support of the jury verdict in favor of Mrs. Scott is not insufficient.[12] Rule 84.16(b). Further dis-

---

**11.** See *Bova v. Roig*, 604 N.E.2d 1(Ind.App.1992) (holding that only one statutory cap limiting health care provider's liability to specified amount applies even when there are two separate and distinct occurrences of malpractice; statutory limit "per occurrence" must be read in conjunction with limit on amount recoverable "for any injury or death"). Cf. *Wiltshire v. Government of Virgin Islands*, 893 F.2d 629 (3rd Cir.1990)

(interpreting similar statutory language to mean statutory cap applies to each separate and distinct "occurrence of malpractice," so that multiple caps apply in cases where there are multiple acts of malpractice).

**12.** In view of our resolution of the issue on this basis, we do not address the merits of plaintiffs' responsive contention that, as a matter of law, the language of § 538.300 does

cussion would have no precedential value. Point denied.

### 5. Alleged Improper Admission of Expert Testimony

■ In its fifth point, Hospital asserts that the trial court erred and abused its discretion in admitting the testimony of one of plaintiffs' experts concerning the cost of Matthew's future home care. Hospital argues that a proper foundation was not laid for this opinion testimony, in that the expert relied in part upon hearsay statements provided by plaintiffs' counsel concerning the present cost of home care in the St. Louis market, and there was no evidence that such statements were "otherwise reasonably reliable" within the meaning of § 490.065.3.

■ However, the expert testified that the information on which he based his opinion was of the type normally relied upon by experts in the field. The trial judge may exercise reasonable discretion in deferring to the expert's assessment of what data is reasonably reliable. See *Wulfing v. Kansas City Southern Industries*, 842 S.W.2d 133, 152 (Mo.App. W.D. 1992). The record further shows there was independent evidence of the cost of these home care services; Mrs. Scott had testified that she was familiar with these costs through her employment and that the costs would be approximately $10 per hour. Finally, we note that the jury's verdict on future care costs was very close to the value given by Hospital's expert. Hospital was not prejudiced by the challenged testimony. Point V is denied.

### 6. Apportionment of Non-economic Damages

■ In its sixth and last point, Hospital argues in the alternative that the court

not permit remittitur of an excessive verdict

improperly calculated its apportionment of the non-economic damages. Hospital contends that, assuming *arguendo* that Dr. Koch was Hospital's agent, that Hospital was not entitled to a 75% reduction in the verdict, and that two non-economic damage caps were applicable pursuant to § 538.210, nevertheless, the court's apportionment of non-economic damages—prior to further reductions in the verdict to reflect the Koch settlement—should have been calculated only after application of the damage caps.

Failure to do so, Hospital contends, effectively resulted in the trial court attributing 50% of the non-economic damages to the actions of Dr. Doumit, who was found by the jury to be only 25% at fault, and likewise in attributing 50% of such damages to Dr. Koch, who was found to be 75% at fault. Hospital proposes that the trial court should have first reduced the total non-economic damages to the statutory cap amount of $1,056,000 ($528,000 × 2), then apportioned this total using the percentage of fault assigned to the two doctors. Under this formula, prior to reduction in the verdict to reflect the settlement, (a) Dr. Doumit would be liable for $264,000 (25% of the non-economic damages) + $486,250 (25% of economic damages), for a total of $750,250 on Matthew Scott's claim; and (b) Dr. Koch would be liable for $792,000 (75% of the non-economic damages) + $1,458,750 (75% of economic damages), for a total of $2,250,750 on Matthew Scott's claim.

Hospital cites no law in direct support of its alternative calculation. Nor given that both doctors were found to be agents of Hospital, and thus 100% of the non-economic damages were in effect attributed to Hospital—does Hospital in any way at-

in a medical malpractice action.

tempt to show how it was prejudiced by the alleged error. Point denied.

The judgment is affirmed.

PAUL J. SIMON, J., concurs.

CLIFFORD H. AHRENS, J., concurs in result only.