**Karen LINDQUIST, as the Personal Representative of the Estate of Michael Lindquist, Deceased, Appellant,**

v.

**SCOTT RADIOLOGICAL GROUP, INC., Mid–America Orthopedic Surgery, Inc., and Barnes–Jewish St. Peters Hospital, Respondent.**

No. ED 84085.

Missouri Court of Appeals,
Eastern District,
Division Two.

May 31, 2005.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 18, 2005.

Application for Transfer Denied
Aug. 30, 2005.

---

James E. Hollverson, Jr., Clayton, MO, for appellant.

Donald P. Myre, Robyn G. Fox, Paul N. Venker, St. Louis, MO, for respondents.

PATRICIA L. COHEN, Presiding Judge.

## Introduction

Karen Lindquist ("Plaintiff"), the Personal Representative of the Estate of Michael Lindquist, appeals from a judgment of the Circuit Court of the City of St. Louis, which granted: (1) a new trial to Mid–America Orthopaedic Surgery ("Mid–America") and Barnes–Jewish St. Peters Hospital ("Barnes–Jewish"); and (2) judgment notwithstanding the verdict ("JNOV") to Scott Radiological Group ("Scott Radiological") in connection with Mr. Lindquist's claims for personal injury as a result of medical negligence. Barnes–Jewish also contends that the trial court erred in denying its motions for directed verdict, as well as its Motion for JNOV, and on the grounds that Plaintiff failed to adduce evidence of agency sufficient to impose vicarious liability. We affirm in part and reverse and remand in part.

## Background

In March 1999, at age 51, Michael Lindquist developed pain between his shoulder blades. In an attempt to control the pain, Mr. Lindquist took over-the-counter medication. However, the pain worsened and, in early April 1999, Mr. Lindquist saw his family physician, Dr. Farrell. After an examination, Dr. Farrell diagnosed Mr. Lindquist as having "thoracic somatic dysfunction," administered osteopathic manipulation and prescribed medication.

When the manipulation and medication did not alleviate the pain, Mr. Lindquist sought a second opinion from Dr. Weis, an orthopedic surgeon. The intake nurse's records from Mr. Lindquist's April 20, 1999 visit indicate that he told the intake nurse that he was experiencing "sharp pain, squeezing pressure pain, in his upper back, right side, his mid back on the right side for approximately one week ... [and that] standing up and moving around is best position." When asked if he had done anything to injure his back, Mr. Lindquist explained that he washed his truck and picked up a couch. After examining Mr. Lindquist, Dr. Weis diagnosed him with "thoracal lumbar sprain with exacerbation of degenerative arthritis in his back." Dr. Weis prescribed muscle relaxants and pain medication, and scheduled Mr. Lindquist for a follow-up examination two weeks later.

Mr. Lindquist returned to Dr. Weis on May 4, 1999 complaining of continued soreness and trouble sleeping. At a May 11, 1999 appointment, Mr. Lindquist reported that his back was "a little better." In his medical records, Dr. Weis noted that Mr. Lindquist had "good healing of the muscle spasm." Dr. Weis further reported: "[T]his patient was improving greatly, to the point that he was almost over the symptoms that he presented with. I saw no reason at all to pursue any further examination of that patient in a particular area that was involved or any further testing that needed to be done. I fully expect him at the next visit no complaint [sic] or not return at all."

However, on May 25, 1999, Mr. Lindquist returned to Dr. Weis complaining of

increasing back pain at night rendering him unable to sleep. Dr. Weis believed that Mr. Lindquist's increased pain at night and inability to sleep was due to degenerative arthritis in his back. Accordingly, Dr. Weis adjusted Mr. Lindquist's medications and ordered Mr. Lindquist to return in two weeks. Mr. Lindquist returned on June 1, 1999 complaining of muscle spasms. Dr. Weis attempted to relieve the spasms through manipulation and again altered Mr. Lindquist's medications. Mr. Lindquist never returned to Dr. Weis.

On June 7, 1999, Mr. Lindquist experienced mid-back pain that radiated into his chest. Fearing that Mr. Lindquist was having a heart attack, Plaintiff transported her husband to the emergency room at Barnes–Jewish Hospital in St. Peters. After Mr. Lindquist signed forms consenting to medical treatment, Doctors Gardiner and Deline treated Mr. Lindquist. Dr. Gardiner ordered a chest x-ray and released Mr. Lindquist and instructed him to return to his physician, Dr. Farrell, and to have an ultrasound of his gall bladder the next day.[1]

On or about June 25, 1999, Mr. Lindquist called Dr. Farrell's exchange complaining of numbness in his lower chest area and legs. In response, the on-call doctor, Dr. Hingst, wrote a prescription for additional medication. At an appointment with Dr. Hingst on June 28, 1999, Dr. Hingst prescribed an "MRI L-spine," a lumbar MRI. Mr. Lindquist's symptoms, however, were concentrated in the thoracic area of his back. Plaintiff and Mr. Lind-

quist went directly from Dr. Hingst's office to have the MRI. Dr. McCown, a radiologist, reviewed the MRI and prepared a report indicating only degenerative changes in Mr. Lindquist's lower back.

Later that same evening, Mr. Lindquist discovered that he could not get off of the toilet or lift his legs after attempting to move his bowels. An ambulance transported Mr. Lindquist to Barnes–Jewish Hospital in St. Peters. On June 29, 1999, Mr. Lindquist was transferred to Barnes–Washington University where he learned that an x-ray and MRI revealed multifocal plasmacytoma, or malignant tumors of the plasma cells. Essentially, Mr. Lindquist became a paraplegic when his 5th thoracic vertebra disintegrated due to undiagnosed spinal cancer.

Mr. Lindquist filed suit against the corporate employers of eight doctors for alleged delayed diagnosis and treatment of Mr. Lindquist's spinal cancer.[2] The named defendants included: Scott Radiological; Barnes–Jewish; Family Medical Group of St. Peters, Inc.; Mid–America; SEC/EMCARE Emergency Care, Inc.; EMCARE Physician Services, Inc.; EMCARE of Missouri, Inc.; Multi–Care Medical, P.C.; Washington University; and Nydic Open MRI of Missouri.[3] The case was tried, and, on May 13, 2003, a jury returned a verdict in favor of Mr. Lindquist on his personal injury claim and awarded him damages as follows: $5.5 million ($1,750,000 for past economic damages, including medical damages; $1,750,000 for past non-economic damages; $1,000,000 for future economic damages,

1. The gall bladder ultrasound and the tests completed at Barnes–Jewish St. Peters Hospital ruled out major abdominal ailments.

2. Plaintiff, in her own behalf, brought a separate cause of action against all defendants for loss of consortium. The jury found in favor of Plaintiff on her individual claim and awarded

her $675,000 for past non-economic damages and $675,000 for future non-economic damages for a total of $1,350,000.

3. This appeal involves claims against Mid–America, Barnes–Jewish and Scott Radiological.

excluding medical damages; and $1,000,000 for future non-economic damages).

On June 18, 2003, the trial court entered its judgment on the verdict. Three defendants, Mid–America, Scott Radiological and Barnes–Jewish, filed post-trial motions.[4]

Mid–America filed a Motion for Judgment Notwithstanding the Verdict and in accordance with the Motion for Directed Verdict, or, in the alternative, Motion for a New Trial or, in the alternative, Motion to Amend the Judgment. In its Motion for Judgment Notwithstanding the Verdict, Mid–America alleged, *inter alia*, that: (1) Plaintiffs failed to produce legally sufficient evidence to make a submissible case of negligence, causation or damages against Mid–America; and (2) the verdict returned by the jury was manifestly irregular and defective because it permitted multiple recoveries for the same injury or category of damages.

In its alternative Motion for a New Trial, Mid–America alleged, *inter alia*, that: (1) the verdict against Mid–America was against the weight of the evidence because the only evidence of past economic loss was medical bills amounting to approximately $200,000 and the jury returned a verdict of $1,750,000 for past economic damages; and (2) the award of $1,000,000 for future economic damages was not supported by the evidence because Mr. Lindquist earned $87,000 per year prior to his voluntary retirement and, post-retirement, received substantial benefits from the school district. Mid–America further alleged that a new trial was necessary because of instructional errors. Specifically, Mid–America alleged, *inter alia*, that Instructions 18, 20, 22, 24 and 26:(1) included

improper roving commissions; (2) were not contained in M.A.I.; and (3) were contrary to M.A.I. Furthermore, Mid–America alleged that the verdict and judgment in favor of Plaintiffs was grossly and shockingly excessive in amount indicating juror passion, prejudice and sympathy.

In its alternative Motion to Amend Judgment on non-economic damages, Mid–America alleged that a single statutory cap for non-economic damages should be applied to the award of $1,000,000 in non-economic damages. Mid–America further alleged that the verdict and judgment were manifestly irregular and defective because of erroneous instructions and an erroneous verdict form.

Scott Radiological filed a Motion for Judgment Notwithstanding the Verdict, or in the alternative, Motion for New Trial. In its Motion for Judgment Notwithstanding the Verdict, Scott Radiological alleged, *inter alia*, that there was no legally sufficient medical evidence to indicate that: (1) Mr. Lindquist's damages were caused by care and treatment provided by Dr. McCown; (2) there was a discrepancy between the order for an MRI of the lumbar spine and the symptoms questionnaire completed by Mr. Lindquist; and/or (3) Dr. McCown had a duty to attempt to contact Dr. Hingst about the alleged discrepancy.

In its alternative Motion for a New Trial, Scott Radiological alleged, *inter alia*, that: (1) the verdict was against the weight of the evidence in that evidence revealed that Dr. McCown did not have a duty to contact Dr. Hingst and that Mr. Lindquist's condition and eventual outcome was not caused by any negligent acts by Dr. McCown; (2) Instruction Number 7

4. None of the post-trial motions alleged error with respect to the verdict in favor of Mrs. Lindquist.

constituted an improper roving commission; (3) the trial court erroneously refused to grant its motion for directed verdict because Plaintiffs failed to make a submissible case; and (4) the verdict against all defendants was grossly excessive, indicating bias, passion and prejudice on the part of the jury.

Defendant Barnes–Jewish filed a Motion for Judgment Notwithstanding the Verdict, or in the alternative, Motion for New Trial, or in the alternative, Motion to Amend Judgment or for Remittitur. In its Motion for Judgment Notwithstanding the Verdict, Barnes–Jewish alleged, *inter alia,* that the trial court erred when it denied its motion for directed verdict at the close of the evidence because, Plaintiffs failed to establish a submissible claim: (1) of actual agency; (2) of apparent or ostensible agency; (3) of the application of the borrowed servant or agent doctrine; and (4) that either Dr. Gardiner or Dr. Deline caused any of the Lindquists' injuries or damages.

In its alternative Motion for New Trial, Barnes–Jewish alleged, in pertinent part, that a new trial was warranted because: (1) the trial court made several instructional errors; (2) the verdict against Barnes–Jewish was against the weight of the evidence because expert testimony revealed that both Drs. Gardiner and Deline acted within the applicable standard of care; (3) Plaintiffs failed to present sufficient expert testimony that either Dr. Gardiner or Dr. Deline was negligent; and (4) the entire verdict was excessive.

In its alternative Motion to Amend Judgment according to the evidence or under the principles of remittitur, Barnes–Jewish alleged, *inter alia,* that the jury's verdict in favor of Mr. Lindquist in the amount of $1,750,000 for past economic damages was unsupported by the evidence

because evidence at trial indicated only $200,000 in medical expenses, and at most $150,000 in lost wages totaling $350,000. Accordingly, Barnes–Jewish contended that the past economic damages aspect of the award was at least $1,400,000 too high and should be set aside or reduced by that amount under principles of remittitur.

On October 16, 2003, the trial court granted Scott Radiological's JNOV. In the same Order, the trial court determined that the verdict of $5,500,000 in favor of Mr. Lindquist exceeded fair and reasonable compensation for his injuries. In particular, the trial court noted that the award to Mr. Lindquist of $1,750,000 in past economic damages was excessive and that such calculation "must be the result of passion" and ordered "a new trial on all issues" in favor of Mid–America and Barnes–Jewish. The trial court further found that a new trial must be granted because several instructions gave the jury an improper roving commission. Accordingly, the trial court set aside the judgment in favor of Mr. Lindquist and against Mid–America and Barnes–Jewish. This appeal followed.[5]

### *Standard of Review*

We review a trial court's ruling on a motion for new trial for abuse of discretion. *Hyde v. Butsch,* 861 S.W.2d 819, 820 (Mo.App. E.D.1993). The trial court abuses its discretion "when a trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration...." *Wingate by Carlisle v. Lester E. Cox Medical Center,* 853 S.W.2d 912, 917 (Mo. banc 1993). When presented with the grant of

5. Plaintiff initially appealed directly to the Missouri Supreme Court. The Supreme Court transferred the case to the Eastern District on January 27, 2004.

a new trial following a plaintiff's verdict, we view the evidence and all inferences therefrom in the light most favorable to the plaintiff. *Luyties Pharmacal Co. v. Frederic Co., Inc.*, 716 S.W.2d 831, 833 (Mo.App. E.D.1986). We are also guided by the principle that "[c]ourts should not overturn a jury verdict lightly. Trials are costly—for the litigants, the jurors and taxpayers." *Keltner v. K–Mart Corp.*, 42 S.W.3d 716, 722 (Mo.App. E.D.2001).

■ When reviewing whether a verdict was excessive, we view the evidence in the light most favorable to the verdict and disregard any unfavorable evidence to the contrary. *Ince v. Money's Bldg. & Dev., Inc.*, 135 S.W.3d 475, 479 (Mo.App. E.D. 2004). We consider the case on its own facts to ultimately decide what fairly and reasonably compensates that specific plaintiff for the damages sustained. *Id.*

■ A trial court order granting a new trial on grounds of instructional error involves a question of law, and accordingly, we must examine the record presented to determine whether the challenged instructions were erroneous and, if so, whether such instructions prejudiced the complaining party. *Wallace v. May*, 822 S.W.2d 471, 472 (Mo.App. E.D.1991).

■ In reviewing a trial court's grant of JNOV, we assess whether the plaintiff made a submissible case. *Pikey v. Gen. Accident Ins. Co. of Am.*, 922 S.W.2d 777, 780 (Mo.App. E.D.1996). We review the trial court's grant of JNOV by considering only the evidence that supports the verdict and the inferences reasonably drawn therefrom. *Id.* We affirm "only if there is no room for reasonable minds to differ on the issues and if the trial court's action is supported by at least one of the grounds raised." *Id.* Moreover, we affirm if the trial court's ruling was proper for any

reason, even if its assigned grounds were wrong. *Metropolitan Tickets, Inc. v. City of St. Louis*, 849 S.W.2d 52, 53 (Mo.App. E.D.1993).

### *Discussion*

### A. The Motions for New Trial

■ As an initial matter, we review the rationale for the grant of a new trial on all issues where a trial court has found juror passion and prejudice. As the Supreme Court has held:

> [w]here a verdict is shown to be the result of passion and prejudice on the part of the jury, then the entire verdict and judgment will be presumed to be so tainted with the poison that nothing short of a new trial will extract the virus. A jury so dominated and blinded by passion and prejudice as to render a verdict beyond all reason as to the amount cannot be held to have given the losing party a fair trial in other respects.

*Clark v. Atchison & Eastern Bridge Co.*, 333 Mo. 721, 62 S.W.2d 1079, 1082 (1933). In short, a trial court that finds passion and prejudice from an excessive verdict is concluding that "the judgment is severely prejudicial and can only be addressed through a new trial." *Graham v. County Med. Equip. Co., Inc.*, 24 S.W.3d 145, 148 (Mo.App. E.D.2000).

### 1. Excessiveness of the verdict—jury prejudice and passion

■ We first address Plaintiff's second point in which she contends that the trial court improperly relied on the size of the verdict alone in finding that the verdict was the product of passion and prejudice. Mid–America counters that the trial court is permitted to and properly found in this case, juror passion and prejudice based on

the size of the verdict alone.[6]

This court carefully articulated the proper approach to reviewing a trial court's grant of a new trial based on the excessiveness of the verdict in *Bodimer v. Ryan's Family Steakhouses, Inc.*, 978 S.W.2d 4 (Mo.App. E.D.1998). In *Bodimer*, we described the two types of excessive verdicts: "(1) where the verdict is simply disproportionate to the proof of injury and results from an honest mistake by the jury in assessment of the evidence and, (2) where the verdict's excessiveness is engendered by trial error or misconduct and thus results from the bias and prejudice of the jury." *Bodimer*, 978 S.W.2d at 9.

With respect to the first category of excessiveness, we concluded that a verdict "may be corrected by an enforced remittitur and does not require a retrial." *Id.* However, the second category of excessive verdicts "is prejudice and can only be remedied with a new trial." *Id.* Most importantly, as it impacts this case, we held that "a new trial is only available upon showing trial error indicated prejudice in the jury, and the amount of the verdict by itself is not enough to establish [the] verdict was [the] result of bias, passion and prejudice." *Id., citing Larabee v. Washington*, 793 S.W.2d 357, 359 (Mo.App. W.D. 1990) (overruled on other grounds). Because we found in *Bodimer* that the bias which supported the grant of the new trial constituted "the excessiveness of the verdict in relation to what the trial court perceived as the evidence" and we found no evidence of trial error or misconduct we reversed the grant of a new trial and remanded with instructions to enter judgment in accordance with the jury's verdict.

Despite the guidance of *Bodimer*, Mid–America relies, as did the trial court, on

*Anderson v. Burlington Northern R.R. Co.*, 700 S.W.2d 469, 477 (Mo.App. E.D. 1985) for the proposition that the "law is clear that the trial court may find passion and prejudice of the jury from the excessiveness of the verdict alone." Although *Anderson* does state that "the trial court may find passion and prejudice by the jury from the excessiveness of the verdict alone," the applicability of this proposition here is questionable. First *Anderson*, unlike this case and *Bodimer*, involves an appeal of the trial court's denial of a motion for new trial on grounds of excessiveness. Second, the same judge who authored *Anderson* authored *Bodimer* fifteen years later and the court in *Bodimer* very clearly connects a finding of jury passion and prejudice to trial court error or jury misconduct at the trial court level.

■ Moreover, even assuming a distinction between the trial court's role and the appellate court's role, a review of the rationale for the distinction persuades us that it is not applicable here. In *Sofian v. Douglas*, 324 Mo. 258, 23 S.W.2d 126 (1929), the Supreme Court thoroughly discussed the trial court's and appellate court's different functions in reviewing a claim that the verdict is excessive. The Supreme Court noted that when a trial court considers the excessiveness of a verdict, it has more latitude than an appellate court because of the trial court's greater ability to assess the weight of the evidence. *Sofian*, 23 S.W.2d at 129. Thus, when a trial court infers bias and prejudice from the size of a verdict alone, it acts within the context of its discretion to determine whether a verdict is against the weight of the evidence. *Id.*

Here, however, the trial court was apparently unaware of, and therefore declined to exercise, its authority to deter-

---

**6.** Neither Barnes–Jewish nor Scott Radiological responded to this point.

mine whether to grant a new trial on the grounds that the verdict as a whole was against the weight of the evidence based on its size alone.[7] Having declined to find that the verdict as a whole was against the weight of the evidence based on its size, the trial court here is in no different position than an appellate court which, because it does not weigh the evidence, is prohibited from inferring passion and prejudice from the mere size of the verdict. *See Means v. Sears, Roebuck & Co.,* 550 S.W.2d 780, 788 (Mo. banc 1977) ("mere size of the verdict does not in and of itself establish that it was the result of bias and prejudice without showing some other error committed during trial").

In addition, Mid–America's attempt to decouple a finding of jury passion and prejudice from jury misconduct, thereby diminishing the seriousness of such a finding, is neither consistent with *Bodimer* nor supported by either older or more recent Supreme Court cases. In *Clark,* 62 S.W.2d at 1083, the Supreme Court held that:

> [T]he mere fact that the court trying the case originally or on appeal comes to the conclusion that a verdict is excessive is far from finding that same resulted from passion and prejudice. If the mere fact of the verdict being found excessive without more is sufficient to show passion and prejudice, then all excessive verdicts demand new trials.

Likewise, in *Jones v. Pennsylvania R.R. Co.,* 353 Mo. 163, 182 S.W.2d 157, 159 (1944), the Supreme Court, relying heavily on *Sofian v. Douglas, supra,* noted that there was a "vital distinction" between excessive verdicts and verdicts so grossly excessive (or inadequate) as to indicate bias and prejudice. Further elaborating,

the Supreme Court stated that "the specified ground, 'because the verdict is so grossly excessive as to indicate that it was the result of bias and prejudice,' *savors of misbehavior on the part of the jury." Jones,* 182 S.W.2d at 159. (emphasis added); *see also Bailey v. Interstate Airmotive,* 358 Mo. 1121, 219 S.W.2d 333 (1949) (excessiveness as would indicate the verdict was the result of bias and prejudice "savors of misbehavior on part of the jury"); *Skadal v. Brown,* 351 S.W.2d 684, 690 (Mo.1961) (bias and prejudice referred to as jury "misbehavior"); *Heins Implement v. Highway & Transp. Comm'n,* 859 S.W.2d 681 (Mo. banc 1993) (decision to grant new trial based on size of award rests with trial court because of its ability to judge impact of alleged trial errors on jury). The Western District has also noted that a jury which awards a verdict which is simply too bountiful under the evidence is culpable only of an honest mistake and not of misconduct requiring a new trial. *Letz v. Turbomeca Engine Corp.,* 975 S.W.2d 155, 175 (Mo.App. W.D. 1997).

Here there is no question that the trial court made no finding of any jury misconduct or misbehavior. Nor did the trial court point to any trial errors, with the exception of instructional error discussed below. Moreover, although in their motions for new trial, Defendants blamed jury passion and prejudice for the size of the verdict as a whole, the only specific allegations of excessiveness related to the absence of evidence to support the size of the past and future economic damage awards, claims typically associated with "mere excessiveness" rather than "gross excessiveness" and generally corrected by remittitur. Finally, the record is devoid of

---

7. The Order contains the following conclusion: "The Court is not aware of any authority that authorizes it to grant a new trial because the verdict is against the weight of the evidence, based on excessiveness of the verdict alone."

any suggestion that the jury engaged in any misbehavior which vitiated the verdict as a whole.

As in *Bodimer,* there is nothing in this record that indicates the alleged excessiveness of the verdict was "engendered by trial error or misconduct and thus results from the bias and prejudice of the jury." 978 S.W.2d at 9. Nor does the record support a finding that the award was grossly excessive rather than merely excessive, even without considering whether trial error or jury misconduct was present. Accordingly, the trial court abused its discretion in granting a new trial on the basis of gross excessiveness resulting from jury bias and prejudice.

## 2. Fair and Reasonable Compensation—overall award

 In her second point, Plaintiff also challenges the trial court's finding that the total award of five and one half million dollars exceeded fair and reasonable compensation and thus was "the result of passion." [8] Typically, where a jury has "awarded a sum disproportionate to the amounts usually awarded for comparable injuries under the rule of uniformity ... [s]uch a mistake can be cured and corrected without a new trial, by requiring a remittitur of a portion of the amount awarded." *Skadal,* 351 S.W.2d at 689. As we have held:

> [w]here the jury errs by awarding a verdict which is simply too bounteous

under the evidence, injustice may be prevented by ordering a remittitur. A new trial is not required because the jury is not guilty of misconduct, only an honest mistake as to the nature and extent of the injuries.

*Larabee,* 793 S.W.2d at 360. Here, as the trial court correctly determined, remittitur was unavailable. *See* Section 538.300 and *Callahan v. Cardinal Glennon Hosp.,* 863 S.W.2d 852, 873 (Mo. banc 1993).

 We first consider whether the award, as a whole, exceeded fair and reasonable compensation. As a general matter, a jury's award should "fairly and reasonably" compensate the plaintiff. *Callahan,* 863 S.W.2d at 872. Our Supreme Court has set forth factors for a jury to consider when determining a figure that fairly and reasonably compensates the plaintiff for his injuries. *See Kenton v. Hyatt Hotels Corp.,* 693 S.W.2d 83, 98 (Mo. banc 1985) and *Callahan,* 863 S.W.2d at 872. More specifically, the jury should consider, "the nature and extent of injury, diminished earning capacity, economic condition, plaintiff's age, and awards in comparable cases." *Callahan,* 863 S.W.2d at 872. A jury is also entitled to consider "certain intangibles" such as "past and future pain, suffering, effect on life-style, embarrassment, humiliation, and economic loss." *Id.* (citation omitted.) Importantly, our Supreme Court directs us to grant a jury

---

8. The trial court actually made two different findings as follows: (1) "The Court finds that the verdict of $5,500,000 in favor of plaintiff Michael Lindquist exceeds fair and reasonable compensation for his injuries[;]" and (2) "[t]he Court finds the award of damages in favor of plaintiff Michael Lindquist, and in particular the award of $1,750,000 for past economic damages, so grossly exceeds fair and reasonable compensation for his injuries and damages that it must be the result of passion." These two findings are, in the con-

text of the law which has developed around analysis of excessive damage claims, contradictory. In general, a finding that an award exceeds fair and reasonable compensation is considered to be the product of an "honest mistake" and subject to remittitur. *Bodimer,* 978 S.W.2d at 9. A finding that an award grossly exceeds fair and reasonable compensation such that it is the product of passion and prejudice is subject only to a new trial on liability and damages.

"virtually unfettered" discretion in reaching its decision because there is a "large range between the damage extremes of inadequacy and excessiveness." *Id.* (citation omitted.)

When faced with the task of reviewing whether a verdict was excessive on appeal, "we view the evidence in the light most favorable to the verdict, disregarding unfavorable evidence to the contrary." *Ince*, 135 S.W.3d at 479. There is no precise formula for determining if a verdict is excessive. *Firestone v. Crown Center Redevelopment Corp.*, 693 S.W.2d 99, 108 (Mo. banc 1985). Accordingly, we consider each case on its own facts to ultimately decide what fairly and reasonably compensates a plaintiff for the damages sustained. *Ince*, 135 S.W.3d at 479.

At trial, Mr. Lindquist offered compelling testimony about how paralysis changed his life. By way of background, Mr. Lindquist revealed that he began having back problems when he was working as an assistant principal at Fort Zumwalt North High School. As a principal, Mr. Lindquist supervised the lunchroom and met with students with attendance or discipline problems. He attended school activities both at Fort Zumwalt North High School and at other schools. Although he enjoyed the adults he worked with, he adored the students. In his free time, he was an avid golfer.

Mr. Lindquist became paralyzed when, at age 51, his 5th thoracic vertebra disintegrated due to undiagnosed spinal cancer. Doctors suggested that they try to restore some mobility to Mr. Lindquist by performing surgery to remove pressure from his spine. Despite surgery, Mr. Lindquist did not regain mobility or sensation in his torso below his lower chest.

Mr. Lindquist was hospitalized from June 29, 1999 until August 18, 1999. As a result of his paralysis, Mr. Lindquist could not control his bladder or his bowels. While living on the spinal cord rehabilitation floor of the hospital, Mr. Lindquist learned to catheterize himself in order to relieve his bladder. At the hospital, Mr. Lindquist underwent physical therapy and occupational therapy twice a day, five days a week. In order to go to therapy, Mr. Lindquist needed to wear a brace because he could not control his body. At physical therapy, Mr. Lindquist performed basic exercises in an attempt to restore some muscle control. At occupational therapy, Mr. Lindquist had to re-learn to dress himself. Because of his paralysis, Mr. Lindquist was required to use special tools to put on pants and socks. Mr. Lindquist also learned to use a transfer board to enable him to get into a car, move himself from a chair to his bed or from his wheelchair to another chair. The therapists visited the Lindquist home to continue therapy upon Mr. Lindquist's release.

The realities of living in a wheelchair forced the Lindquists to make numerous adjustments to their lives once Mr. Lindquist came home from the hospital. The Lindquists had to purchase a van with a wheelchair ramp. Because they lived in a two-story home with all bedrooms upstairs, Plaintiff ordered a hospital bed and set it up in the living room so that, once home, Mr. Lindquist had a place to sleep. In light of his lost bowel control, Mr. Lindquist often had bowel movements in his bed. At work, Mr. Lindquist wore a leg bag to catch his urine. Despite the leg bag, Mr. Lindquist had some "accidents" at work in front of his students and his colleagues.

The Lindquists' home had only one-half bath on the main floor and Mr. Lindquist's wheelchair did not fit into the half bathroom. With no shower on the first floor, Mr. Lindquist took sponge baths in his bed

until a carpenter friend converted the laundry room into a shower. The shower included a bench with a hole and bucket in case Mr. Lindquist's bowels emptied while in the shower. After a while, the Lindquists learned to perform enemas to try to regulate when his bowels would empty. Although the Lindquists considered making more adjustments to their home, they ultimately sold and built a new more accessible home.

Mr. Lindquist continued in outpatient therapy where he did exercises and wore battery-powered stimulator on his legs to help stimulate muscles that had atrophied. Slowly, Mr. Lindquist began to make strides. Mr. Lindquist first regained some feeling in his toes, then his legs. Through the use of machines, the therapists helped Mr. Lindquist bear weight on his legs. With the use of leg braces, therapists helped Mr. Lindquists take a few steps. Ultimately, Mr. Lindquist walked with the assistance of a walker. At the Class of 2001 graduation ceremony, Mr. Lindquist labored to walk for his students with the use of canes. Despite these strides the Lindquists never resumed a marital love life due to separate rooms, separate beds and the swelling and sores Mr. Lindquist suffered from spending most of his day in the wheelchair.

Despite his physical accomplishments, in the summer of 2001, Mr. Lindquist learned that he needed a stem cell transplant. Mr. Lindquist missed two months of school due to the transplant. Exhausted by any activity and feeling like he was a hardship on his wife and the school, Mr. Lindquist retired from his job in 2002. Mr. Lindquist testified that, at the time of his retirement, Mr. Lindquist was earning approximately $87,000 per year.

At the close of all evidence, the jury awarded $5.5 million ($1,750,000 for past economic damages, $1,750,000 for past non-economic damages, $1,000,000 for future economic damages, and $1,000,000 for future non-economic damages) to Mr. Lindquist. The jury awarded an additional $1,350,000 ($675,000 for past non-economic damages and $675,000 for future non-economic damages) to Plaintiff.

The record clearly supports the jury's award in this case. Specifically, the evidence disclosed that Mr. Lindquist was rendered paraplegic when, at age 51, despite repeated doctor and hospital visits, Defendants failed to timely diagnose and treat his spinal cancer. The evidence adduced revealed that the paralysis Mr. Lindquist suffered was a significant, devastating event that forced him to incur substantial medical bills, retire from his job at a local high school, and completely alter his life. A review of comparable cases reveals that, given Mr. Lindquist's injuries and the consequences that necessarily followed, a $5.5 million award is not excessive. *See Lay v. P & G Health Care, Inc.*, 37 S.W.3d 310 (Mo.App. W.D.2000) (damages award of $9,252,500 not excessive where dumbwaiter fell on repairman and caused a massive head injury, requiring several surgeries, and chronic dizziness, blindness, drooling, no sense of smell or taste, headaches, hearing loss, pain and discomfort, airway obstruction, and difficulty fighting life-threatening infections); *Fowler v. Park Corp.*, 673 S.W.2d 749 (Mo. banc 1984) (damages award of $6 million not excessive where 19–year–old lost both of his legs above the knees when run over by a switch engine).

### 3. Fair and Reasonable Compensation—past economic damages

██ In Plaintiff's first point on appeal, she contends the trial court erred in granting a new trial instead of correcting the excessive past economic damage award. Similarly, in Plaintiff's third point on ap-

peal, she argues that "the trial court erred in failing to remit the amount the jury awarded for past economic damages." Moreover, Plaintiff admits that the portion of the award fixing past economic damages exceeds the evidence of Mr. Lindquist's past wages and expenses.[9] Specifically, Plaintiff concedes that:

[T]he proof of past economic losses is discernable [sic] from the record.... [T]he medical-expense claim was for $190,000, a sum certain culled from greater bills everyone agreed arose treating Lindquist's cancer and paraplegia. Defendants did not contest Mr. Lindquist's work absence or lost earnings June 28, 1999 through December 1999; then June 2002 to the time of trial. [Defendants] also agreed that he required a wheelchair-accessible house and car and did not contest Plaintiffs' proof of those amounts.

Plaintiff also concedes that evidence supports a finding that Mr. Lindquist suffered approximately $140,000 in lost past earnings.

Both Barnes–Jewish and Mid–America admit that Plaintiff suffered past economic losses while they simultaneously challenge the extent of those losses. Barnes–Jewish argued in its Motion for New Trial that the past economic damages award was "erroneously high by the amount of $1,400,000, and either the Court should set it aside to that extent as against the weight of the evidence or reduce it by that amount under principles of remittitur." Mid–America contends on appeal that the past economic damages award exceeds the proof offered at trial. Specifically, Mid–America contends that the evidence at trial establishes that Mr. Lindquist incurred

medical bills "in the total amount of $190,491.00." Mid–America also claims that the Lindquists gained $16,000 when they sold their home for $294,000 in order to buy a new wheelchair-accessible house costing $278,000. Furthermore, Mid–America points out that Mr. Lindquist grossed $87,000 per year and at the time of his retirement, and upon retiring received "a retirement salary of $48,000.00 per year."

Here, we are faced with a situation in which the parties as well as the trial court expressly acknowledge a problem with the size of the award for past economic damages. The parties, of course, differ on the solution to the problem. Plaintiff contends that the trial court erred in not "correcting" the verdict, relying primarily on *Jetco Heating & Air Conditioning, Inc. v. Spizman*, 735 S.W.2d 54 (Mo.App. E.D.1987).

In *Jetco*, a case involving a contract to repair storm damage to a roof, the trial court reduced a verdict which was in excess of the amount sought in the pleadings. The appellant argued that the reduction constituted a remittitur in violation of *Firestone v. Crown Center Redevelopment Corp., supra.* This court, in rejecting the appellant's argument held: " . . . the trial court's reduction of the jury verdict did not constitute a remittitur, but was a reduction of the verdict because there was no evidence to support an award which exceeded the $6,000 asked for in the petition."

Mid–America argues that *Jetco* is distinguishable because the claim in *Jetco* was for a liquidated amount, where here the claim is unliquidated. Although the reasoning of the court appears to be

9. The trial court specifically found that the verdict and "in particular the award of $1,750,000 for past economic damages" grossly exceeded fair and reasonable compensation. The trial court also expressly found that it was unable to grant a remittitur because this case was a medical malpractice case, citing *Callahan*, 863 S.W.2d at 873.

broader than Mid–America suggests, we agree that applying *Jetco* to a medical negligence case in which the legislature has expressly prohibited remittitur is unwarranted. Regardless of whether the "reduction" in *Jetco* constituted a remittitur, we conclude that a "reduction" or "correction" to reduce the past economic damages under the circumstances presented in this case would constitute a remittitur. Thus, the trial court did not err in failing to enter a remittitur.

Plaintiff also cites *Vincent by Vincent v. Johnson*, 833 S.W.2d 859 (Mo. banc 1992) for the proposition that the trial court may have had a duty to decrease the verdict if it exceeded proven losses. Plaintiff accurately notes that the Supreme Court in *Vincent by Vincent*, identifies Section 537.068 (the statute authorizing remittitur) as the source of such a duty. However, the reference in *Vincent by Vincent* is not central to any holding in the case and is unquestionably inconsistent with Section 538.300. Accordingly, we decline to assign any error on the basis of *Vincent by Vincent*.

▆▆▆▆ The unavailability of remittitur or the absence of cases permitting a court to "correct" a verdict in lieu of remittitur does not, however, mandate a retrial on all issues where, as here, we determine the record supports a finding of mere excessiveness, i.e., a damage award that is disproportionate to the evidence. When the Supreme Court abolished the practice of remittitur in *Firestone*, it stated that:

[a]bolishment of the remittitur practice in Missouri does no violence to the power and discretion of the trial courts to control jury verdicts. The 1975 revision of Rule 78.01 provides concisely that the trial court may grant a new trial of any issue upon good cause shown, and . . . [on] all or part of the issues.

*Firestone*, 693 S.W.2d at 110. These words are equally applicable to this case where remittitur is unavailable by virtue of statute.

Accordingly, where, as here, the parties and the trial court agree that the past economic damages award is disproportionate to the proof at trial and remittitur is unavailable, a new trial pursuant to Rule 78.01, limited to assessment of past economic damages, is appropriate. Accordingly, we reverse the trial court's grant of a new trial on all issues but affirm its grant of a new trial limited to the issue of past economic damages.[10]

### 4. Instructional Error

▆▆▆▆ Plaintiff alleges that the trial court further erred when it found that certain instructions submitting claims against Mid–America, for care rendered by Dr. Weis, constituted a roving commission.[11] In support of this contention, Plaintiff asserts that these instructions were modeled after three appropriate MAI and properly submitted ultimate facts.

▆▆▆▆ Plaintiff states that Instructions 18, 20, 22, 24 and 26 are patterned after MAI 21.02 and therefore, were properly submitted to the jury because, under Mo. R.Civ.P. 70.02(b), whenever MAI contains an instruction applicable to a particular

---

**10.** We note that in both *Toppins v. Schuermann*, 983 S.W.2d 582, 588 (Mo.App. E.D. 1998) and *Bodimer, supra*, we held that a trial court is not justified in granting a new trial on damages only because of the size of the verdict. However, in both cases, the trial court had the ability to remit a verdict that is simply disproportionate to a plaintiff's damages.

This case is obviously distinguishable because of the unavailability of remittitur.

**11.** Only Defendant Mid–America responded to Plaintiff's allegation that the trial court erred in determining that Instructions 18, 20, 22, 24 and 26 were submitted in error.

case, that instruction shall be given to the exclusion of all other instructions on the same subject. Rule 70.02 acknowledges that MAI does not cover every individual case, and accordingly provides for the modification of the approved instructions. Where an MAI must be modified to fairly submit the issues in a particular case, such modifications "shall be simple, brief, free from argument, and shall not submit to the jury or require findings of detailed evidentiary facts." *Stone v. Duffy Distrib., Inc.,* 785 S.W.2d 671, 678 (Mo.App. S.D.1990).

The trial court found that "a new trial must be granted [because] the Court erred in giving Instructions 18, 20, 22, 22[sic], 24, and 26, which instructions gave the jury a roving commission in that they were too general and failed to identify with sufficient specificity the acts or omissions on the part of the defendant that would constitute liability." Because we are reviewing a trial court order granting a new trial on grounds of instructional error, we examine the record presented to determine whether the challenged instructions were erroneous and, if so, whether such instructions prejudiced Defendant Mid–America. *See Wallace,* 822 S.W.2d at 472.

> Instructions 18, 20 and 22 state:
>
> In your verdict, you must assess a percentage of fault to defendant Mid–America Orthopaedic Surgery, Inc. if you believe:
>
> First, plaintiff Michael Lindquist had a tumor in his spine on [date], and
>
> Second, on [date] Dr. Weis either:
>
>> Failed to take an adequate history, or
>>
>> Failed to perform an adequate physical examination, or

Failed to order MRI of his thoracic spine, and

> Third, Dr. Weis, in any one or more of the respects submitted in paragraph Second was thereby negligent, and
>
> Fourth, such negligence directly caused or directly contributed to cause damage to plaintiff Michael Lindquist.[12]

Instructions 24 and 26 state:

> In your verdict, you must assess a percentage of fault to defendant Mid–America Orthopaedic Surgery, Inc. if you believe:
>
> First, plaintiff Michael Lindquist had a tumor in his spine on [date], and
>
> Second, on [date] Dr. Weis either:
>
>> Failed to take an adequate history, or
>>
>> Failed to perform an adequate physical examination, or
>>
>> Failed to order an X-ray of his thoracic spine, or
>>
>> Failed to order MRI of his thoracic spine, and
>
> Third, Dr. Weis, in any one or more of the respects submitted in paragraph Second was thereby negligent, and
>
> Fourth, such negligence directly caused or directly contributed to cause damage to plaintiff Michael Lindquist.[13]

Mid–America asserts that "lay jurors simply cannot determine what an adequate examination or an adequate history involves without having expert testimony to guide them on this issue" and so the "instruction allowed the jury to roam freely though the evidence and determine on its own what constitutes an adequate examination or history taking." Essentially,

---

**12.** Instruction 18 is based on Mr. Lindquist's visit with Dr. Weis on April 20, 1999. Instruction 20 is based on Mr. Lindquist's visit with Dr. Weis on May 4, 1999. Instruction 22 is based on Mr. Lindquist's visit with Dr. Weis on May 11, 1999.

**13.** Instruction 24 is based on Mr. Lindquist's visit with Dr. Weis on May 25, 1999. Instruction 26 is based on Mr. Lindquist's visit with Dr. Weis on June 1, 1999.

Mid–America contends that the use of "adequate" in this context converts the instructions into improper roving commissions. We disagree.

A jury instruction is a "roving commission" when it "assumes a disputed fact or submits an abstract legal question that allows the jury to 'roam freely through the evidence and choose any facts which suited its fancy or its perception of logic' to impose liability." *Gomez v. Construction Design, Inc.*, 126 S.W.3d 366, 371 (Mo. banc 2004) *citing Seitz v. Lemay Bank and Trust Co.*, 959 S.W.2d 458, 463 (Mo. banc 1998). When, on the other hand, a plaintiff's theory of the case is supported by the evidence and the instruction submits ultimate facts which define for the jury the plaintiff's theory of negligence, the instruction is not a roving commission. *See Lashmet v. McQueary*, 954 S.W.2d 546, 553 (Mo.App. S.D.1997).

When we review jury instructions, we credit jurors with ordinary intelligence, common sense and average understanding of the English language. *Id.* at 552–53. We have reviewed the record and we are not convinced that, under the facts and circumstances of this case, "adequate" is a scientific term requiring definition by expert testimony or that the term "adequate" compelled the jury to employ medical expertise. *See Burns v. Elk River Ambulance, Inc.*, 55 S.W.3d 466, 478–79 (Mo.App. S.D.2001). To the contrary, this jury's ordinary intelligence and common sense were sufficient to allow a determination of whether Dr. Weis asked Mr. Lindquist sufficient questions, listened to Mr. Lindquist's complaints and examined Mr. Lindquist's body, that is, whether Dr. Weis "failed to take an adequate history" or "failed to perform an adequate physical examination."

Even assuming, *arguendo*, that under the facts and circumstances of the case, "adequate" is a term outside the jury's ordinary intelligence and understanding, evidence and expert testimony presented at trial sufficiently defined the term. Specifically, Dr. Leslie explained the four distinct components of a doctor-patient relationship, two of which included taking a medical history and the four pillars of inspection during a physical exam. Dr. Leslie's testimony included references and citations to texts and other authorities that further explained the importance of an adequate history and what constitutes an adequate physical examination of a patient presenting with back pain. Two additional experts, Doctors Dollinger and Safdar, reiterated the type of information that a doctor should strive to extract from a patient, and Dr. Dollinger even noted that there is a standard set of questions that a doctor should ask his patients.

Plaintiff's theory of medical negligence with respect to Mid–America was supported by the evidence and the proffered jury instruction, based on that theory, properly submitted ultimate facts which defined for the jury Plaintiff's specific theory of negligence, and as a result, Instructions 18, 20, 22, 24, and 26 did not constitute a roving commission. *See Lashmet*, 954 S.W.2d at 553. Because we find that the trial court did not err in submitting the challenged instructions, the trial court's order granting a new trial based on instructional error is reversed.

**B. Constitutional Challenge to Section 538.300, R.S.Mo.**

In her third point on appeal, Plaintiff contends that "banning remittitur in medical-malpractice cases while permitting it in other tort cases violates the

Missouri Constitution...." [14] In response, Mid–America asserts that Plaintiff failed to properly preserve the issue below and, therefore, we should not review this claim.[15]

As a general matter, a Constitutional question must be presented at the earliest possible moment that good pleading and orderly procedure will permit under the circumstances, otherwise it will be waived. *Callier v. Dir. of Revenue,* 780 S.W.2d 639 (Mo. banc 1989). To properly raise a Constitutional question, the party must: (1) raise such question at the first available opportunity; (2) designate, by explicit reference, the specific constitutional provision claimed to have been violated; (3) state the facts showing the violation; and (4) preserve such question throughout for appellate review. *Id.* at 641. Moreover, "[i]n order for the issue of constitutional validity of a statute to be preserved for appellate review, the issue must not only have been presented to the trial court, but the trial court must have ruled thereon." *Estate of McCluney,* 871 S.W.2d 657, 659 (Mo.App. W.D.1994).

Here, Plaintiff's challenge to the constitutionality of Section 538.300 was not presented to the trial court, much less ruled on by the trial court. Accordingly, we decline to exercise appellate review over this claim. Point denied.

## C. Scott Radiological Group's JNOV

Plaintiff contends that the trial court erred in granting JNOV to Scott Radiological because there was ample evidence that Dr. McCown was negligent in failing to: (1) recognize a discrepancy between the "MRI–L spine" (or lumbar) script ordered by Dr. Hingst and Mr. Lindquist's symptoms as noted in a questionnaire; and (2) attempt to notify another doctor about the need for a thoracic MRI.

In reviewing a trial court's grant of a JNOV, we consider only the evidence that supports the verdict and the inferences reasonably drawn therefrom. *Pikey,* 922 S.W.2d at 780. "We affirm only if there is no room for reasonable minds to differ on the issues and if the trial court's action is supported by at least one of the grounds raised." *Id.* This court must affirm the trial court if its ruling was proper for any reason, even if its assigned grounds were wrong. *Metropolitan Tickets,* 849 S.W.2d at 53.

Recognizing, perhaps, the deficiencies in proof of causation with respect to Dr. McCown, Plaintiff directs us to the theory of "counterfactual causation" described in *Jackson v. Ray Kruse Construction,* 708 S.W.2d 664, (Mo. banc 1986). Without deciding whether *Jackson,* a premises liability case, is applicable to this medical malpractice case, we find that *Callahan, supra* and *Harvey v. Washington,* 95 S.W.3d 93 (Mo. banc 2003) provide more pertinent guidance. Thus, we find that at a minimum, Plaintiff must causally connect Dr. McCown's conduct to Mr. Lindquist's injury. 95 S.W.3d at 96.

Viewing the record in the light most favorable to Plaintiff, we find that the trial court did not err in granting Scott Radiological's Motion for JNOV because the record lacks sufficient evidence linking Dr. McCown's actions to Mr. Lindquist's injuries. First, Plaintiff argues that Dr.

---

14. In light of the constitutional question, Plaintiff initially filed this case in the Missouri Supreme Court. On its own motion, the Supreme Court transferred the case to the Eastern District.

15. Only Defendant Mid–America responded to Plaintiff's third point on appeal.

McCown should have noted problems with the T–9 vertebrae after viewing the lumbar MRI. However, because the T–9 vertebrae never collapsed and was not a cause of Mr. Lindquist's paralysis, the trial court excluded evidence relating to any T–9 abnormality. Thus, even assuming Dr. McCown should have noted the T–9 abnormality, there was no evidence before the jury connecting the T–9 abnormality to Mr. Lindquist's paralysis. In addition, Plaintiff contends that Dr. McCown had a duty to *attempt* to contact Dr. Hingst about the need for a thoracic MRI. However, the expert testimony failed to connect the "attempt" to contact Dr. Hingst to a different outcome for Mr. Lindquist.

The evidence revealed that Dr. Hingst examined Mr. Lindquist, reviewed the medical records and ordered a lumbar MRI as opposed to a thoracic MRI. Because Dr. Hingst's actions, or inactions, were independently sufficient to cause Mr. Lindquist's injuries, the fact that Dr. McCown read the lumbar MRI which Dr. Hingst ordered could not be the "but for" cause of Mr. Lindquist's injuries. *See Harvey v. Washington,* 95 S.W.3d 93, 97 (Mo. banc 2003) and *Callahan,* 863 S.W.2d at 862.

Accordingly, we affirm the trial court's decision to grant JNOV to Scott Radiological.[16]

## D. New Trial Order (Barnes–Jewish)

█ It her final point on appeal, Plaintiff contends that the trial court's failure to state in its Order the rationale for granting a new trial to defendant Barnes–Jewish is "erroneous per se."

Plaintiffs have failed to brief this point on appeal. Accordingly, we deem this contention abandoned and will not consider this point on appeal. Mo.R.Civ.P. 84.13(a).

## E. Agency Relationship Between Barnes–Jewish and Doctors Gardiner and Deline

█ Barnes–Jewish initially filed a cross-appeal contending that the trial court erred in not granting its motion for JNOV or directed verdict. We issued an Order stating that Barnes–Jewish lacked standing to appeal because it was not an aggrieved party after the trial court granted its motion for a new trial. Specifically, we stated, "[Barnes–Jewish] need not file an appeal to contest the submissibility of plaintiffs' case, an issue inherent in every appeal. [Barnes–Jewish] may raise this issue in its respondent's brief."

Accordingly, in its brief, Barnes–Jewish alleged that the trial court erred in denying its Motion for Directed Verdict at the close of Plaintiff's case, at the close of all the evidence, and its post-trial Motion for JNOV. In support of these contentions, Barnes–Jewish asserts that Plaintiff failed to make a submissible case of agency necessary to impose vicarious liability on Barnes–Jewish for the actions of Dr. Gardiner and Dr. Deline. Barnes–Jewish asserts that the evidence at trial established Dr. Gardiner and Dr. Deline as "independent contractors."

█ As a general matter, a party contracting with an independent contractor is not liable for the independent contractor's negligent actions. *Scott v. SSM Healthcare St. Louis,* 70 S.W.3d 560, 566 (Mo.App. E.D.2002). In contrast, respondeat superior imposes vicarious liability on employers for the negligent acts or omissions of employees or agents as long as the acts or omissions are committed within the

---

**16.** Because of our resolution of this point, we do not reach Scott Radiological's assertion that the trial court erred in submitting Instruction Number 7.

scope of the employment or agency. *Id.* "The relationship of principal-agent or employer-employee is a question of fact to be determined by the jury when, from the evidence adduced on the question, there may be a fair difference of opinion as to the existence of the relationship." *Id., citing Bargfrede v. American Income Life Ins. Co.,* 21 S.W.3d 157, 161 (Mo.App. W.D.2000).

 Agency is established where: (1) the principal must either expressly or impliedly consent to the agent's acting on the principal's behalf; and (2) the agent is subject to the principal's control. *Scott,* 70 S.W.3d at 566. Because this case deals with a hospital-physician relationship, we focus on "whether the hospital generally controlled, or had the right to control, the conduct of the doctor in his work performed at the hospital." *Id.* at 566–67.

 Although Barnes–Jewish cites several facts that could support the conclusion that Dr. Gardiner and Dr. Deline were acting as independent contractors as opposed to agents of Barnes–Jewish, reasonable minds could differ as to whether agency existed. *See Id.* at 567–68 and *Bargfrede,* 21 S.W.3d at 162. The mere fact that Doctors Gardiner and Deline retained freedom to exercise independent medical judgment does not preclude an agency relationship for purposes of vicarious liability. *Scott,* 70 S.W.3d at 568. Based on the record, we conclude that the trial court did not abuse its discretion in denying Barnes–Jewish's motion for JNOV.

### Conclusion

The Judgment of the Circuit Court granting Defendants Mid–America and Barnes–Jewish a new trial is reversed and remanded with instructions that the trial court reinstate the original jury verdicts on all issues except with respect to past economic damages. The case is remanded for a new trial on past economic damages. The Judgment granting Scott Radiological's JNOV is affirmed.

KATHIANNE KNAUP CRANE and ROBERT G. DOWD, JR., JJ., Concur.